## COURT OF APPEALS,
### May, 1907.

## THE PEOPLE *v.* NEWTON L. A. EASTMAN.

(188 N. Y. 478.)

INDECENT PUBLICATIONS—PENAL CODE § 317

The word indecent as used in § 317 of the Penal Code, relates to obscene points or publications. It is not an attempt to regulate manners but it is a declaration of the penalties to be imposed upon the various phases of the crime of obscenity. A publication therefore, attacking a body of Christian clergymen, although vile, scurrilous and reprehensible is not indecent unless it is lewd, lascivious, salacious or obscene and has a tendency to excite lustful and lecherous desire.

Affirming 116 App. Div. 922.

APPEAL from a judgment and order of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 8, 1906, which affirmed a judgment of the Monroe County Court sustaining a demurrer to an indictment charging the defendant with the crime of selling and having in his possession with intent to sell printed matter of an indecent character.

The facts, so far as material, are stated in the opinions.

*Howard H. Widener* and *Stephen J. Warren* for appellant. The statute itself is descriptive of the offense and does not describe or attempt to define what is indecent, but forbids " printed matter of an indecent character." (*People* v. *Muller,* 96 N. Y. 408; *Regina* v. *Hicklin,* L. R. [3 Q. B.] 369.)

*Albert H. Stearns* for respondent. The publication referred to in the indictment is not " indecent " within the meaning and intendment of section 317 of the Penal Code. (*People* v. *Muller,* 96 N. Y. 408; *People* v. *Allen,* 20 Misc. Rep. 120; *U. S.* v. *Hartwell,* 6 Wall. 396; *U. S.* v. *Wilson,* 58 Fed. Rep. 768;

*People* v. *Most,* 171 N. Y. 423; *U. S.* v. *Smith,* 11 Fed. Rep. 663; *U. S.* v. *Bennett,* 16 Blatchf. 338; *Dunlop* v. *U. S.,* 165 U. S. 486; *Swearingen* v. *U. S.,* 161 U. S. 447; *U. S.* v. *Wrightman,* 29 Fed. Rep. 636; *McJenkins* v. *State,* 10 Ind. 140.)

*Per Curiam.* The court is of opinion that the publication set forth in the indictment is improper, intemperate, unjustifiable and highly reprehensible, nevertheless it is not " indecent " as that word is employed in section 317 of the Penal Code.

The definitions given by the standard lexicographers are not controlling in deciding its legal signification; many meanings as used in ordinary conversation are also irrelevant.

Section 317 of the Penal Code is found in chapter VII, headed as follows: " Indecent Exposures, Obscene Exhibitions, Books and Prints, and Bawdy and Other Disorderly Houses."

Section 317 opens as follows: " § 317. Obscene prints. 1. A person who sells, lends, gives away or shows, or offers to sell, lend, give away, or show, or has in his possession, with intent to sell, lend, or give away, or to show, or advertises in any manner, or who otherwise offers for loan, gift, sale or distribution, any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet, *newspaper,* story paper, writing, paper, picture, drawing, photograph, figure or image, or any written or printed matter of an indecent character; "

It is clear from the manner in which the legislature has used the word " indecent " that it relates to obscene prints or publications; it is not an attempt to regulate manners, but it is a declaration of the penalties to be imposed upon the various phases of the crime of obscenity. The word " indecent " is used in a limited sense in this connection and falls within the maxim of *noscitur a sociis.*

The judgment and order appealed from should be affirmed.

CULLEN, Ch. J. I concur in the opinion of the majority of the court, that the article complained of does not fall within the provisions of section 317 of the Penal Code, under which the defendant was indicted, which section makes it a misdemeanor to sell, give away or show any " obscene, lewd, lascivious, filthy, indecent or disgusting book, paper or picture," etc. That the article is a scurrilous and vile attack on a large and respected body of Christian clergymen is unquestionable. That it is " indecent " from every consideration of propriety is entirely clear, but that is not the indecency condemned by this section of the Code. The preceding section punishes indecent exposure of person, the next section the sale of articles for indecent or immoral use. The chapter in which all the sections are found is entitled " Indecent exposures, obscene exhibitions, books and prints, and bawdy and other disorderly houses." From the context of the statute it is apparent that it is directed against lewd, lascivious and salacious or obscene publications, the tendency of which is to excite lustful and lecherous desire. That such is not the effect of the publication is clear from the fact that my brother who writes the dissenting opinion publishes it in full, and I am entirely certain that did he believe the tendency of the article was lecherous and salacious, he would find no justification for its publication in the fact that the majority of the court, from whose decision he feels constrained to dissent, entertain a contrary view. In the English case cited by my brother no part of the improper publication is reproduced, but the report is confined to a statement of its general character. I regret that the publication should appear in the reports of this court, not because I deem it lewd, but because I feel that the reports of this court should not be made the means of perpetuating a scurrilous and wanton slander on any class of the community. This is an example of the extent to which sectarian religious animosities may lead a weak and disordered mind, for it is mere charity to consider such to be the character

of the writer of the production.   Since, however, the article is
to appear, I may challenge its comparison with many that have
been published attacking the Mormon church.   Surely, publica-
tions as to that church have gone far beyond the article now
before us.   It is no answer to say that the Mormons, while they
practiced polygamy, were justly subject to such strictures.   The
truth or falsity of the writing has no bearing on the guilt or in-
nocence of the defendant under this section of the Code.   If
the charges contained in this article had been made, not against
a class but against a single individual, and that individual a
layman, not a clergyman, it would, doubtless, if false, have been
a gross libel.   But it would not be contended that if true it was
indecent and should subject the party writing it to the penalties
prescribed by the Code.

It does not necessarily follow that the defendant is amenable
to no punishment.   The charges in the article being against a
whole class, no single individual could maintain an action for
libel against its author (*Sumner* v. *Buel,* 12 Johns. 475), but
not so, however, as regards a criminal prosecution for libel.
The foundation of the theory on which libel is made a crime is
that by provoking passions of persons libeled, it excites them to
violence and a breach of the peace.   Therefore, a criminal prose-
cution can be sustained where no civil action would lie, as for
instance, in this very case, where the libel is against a class
(*Sumner* v. *Buel, supra; Palmer* v. *City of Concord,* 48 N. H.
211; *State* v. *Brady,* 44 Kan. 435), and also in the case of a
libel against a deceased person.   It may be urged that the ques-
tion whether the defendant should be prosecuted for an indecent
publication or for a libel is a technical one.   This is very far
from being the fact.   So careful have the people of the state
been to secure freedom of speech, subject only to punishment
when a jury has found that that freedom has been abused, that
by the various Constitutions of this state, ever since that of 1822,
it has been expressly enacted that in a prosecution for libel the

truth may be given in evidence and the jury shall have the right to determine the law as well as the fact. This applies to no other criminal prosecution.

O'Brien, J. (dissenting). The defendant was indicted for selling and exposing for sale certain printed matter of an indecent character. The publication was in a newspaper called " The Gospel Worker." By section 317 of the the Penal Code it is made a misdemeanor to sell, or to have in possession, with intent to sell, or to publish, any written or printed matter of an indecent character.

The defendant demurred to the indictment on the ground that it did not state a crime. The demurrer was sustained at the trial court and at the Appellate Division and the People have appealed to this court. The decision under review is to the effect that the paper referred to in the indictment and set out at length is not of an indecent character and, therefore, not within the statute. In this respect I think the courts below were clearly in error, since, in my opinion, it would be difficult to compose any writing more indecent and more immoral. It is so indecent that, in my opinion, it is unfit to appear upon the records of this court and it would not appear as a part of this opinion except for the contention at the bar and in the court itself that it is *not* indecent. Of course, if it is not, then I must be in error in supposing that it is unfit to appear in the records of this court. Therefore, we must allow the writing to speak for itself; and here it is:

## " The Open Door to Hell

" Is the confessional box. It is hell's gate. The mainspring to lust. The very embodiment and focus of the virus of hell. It is the very matter and pus that runs from the corpse in hell. It is the pollution and rottenness of the decay of ages. It is the cesspool, the recipient, the reservoir of lust, of vile thought and communication, adultery, the birthplace of sexual criminality,

with men's wives and young girls, and the convent is earth's terminus and hell, the lake of fire is the dumping-ground. It is the criminal college. The mother of prostitution. The author of pauperism. From it emanates poison to society, homes, our schools and government. I speak in love. No time to trifle. The Anaconda is drawing itself over many a threshold and stinging thousands to death. Hark! A voice from the tomb, the blood of the innocent crying out, in what sense is the confessional box needed? The Word of God says, in 1 John, 1, 9, If we confess our sins, He is faithful and just to forgive our sins and to cleanse us from all unrighteousness. You go direct to God Almighty through Jesus Christ to confess your sins. Not in a concealed and secluded place alone. No wife can go with her husband. Here the priest asks the vilest of questions, and of course the husband could not be present. He asks the most delicate and intimate questions. But under what obligation is any one to a priest? What business has he got to go into a box and ask delicate female questions that no minister of Jesus Christ or true gentleman on earth would ask? Right here in the confessional box many have been ruined, and many become mothers as a result; and men, you are paying your money to priests and to a church that is ruining your daughters and stealing the affections of your wife, until he knows more about her than you do. She has many secrets kept from you, husband, but not from that licentious priest. This is all true, dear reader, and can be proven by thousands of witnesses. May it not well be called the open door to hell? Last month a dear brother gave The Gospel Worker to some in the place where he was at work in this city. It was the January number with the article, ' Break open the Doors and Look In,' and it caused much excitement. Bloody threats and curses were made, and two could not sleep all night, they were so stirred over the truth in it. Was any one ever benefited in any way by going to the confessional box? If it is advice you need why go to that secret place?

Dear reader, Jesus Christ never instituted the confessional. Would he call lustful, licentious, drinking men to ask such low, vile questions, which are unbecoming for any one to ask another? I am sure you say no and begin to see the awfulness of it. You might as well confess to a dead dog. The Roman Church teaches you cannot be saved unless you confess to a priest. Read this from their own teaching: 'If any one shall say that priests who are in mortal sin have not the power of binding or loosing, or that priests are not the only ministers of absolution, let him be accursed.' This does away with Jesus' blood. It makes God second to this fellow in the confessional box. They teach that every sin, the vilest and lowest, the most criminal, by man and woman, must be confessed to the priest. They do not teach it necessary to repent, but to do penance. Notice, this takes the place of repentance. Penance and confession to a wicked priest necessary to salvation? Is there any intelligent person on the earth who believes it? The following is what Margaret L. Shepard, who was for three years an inmate of the Arno's Court Convent, Bristol, Eng., says: 'In a confessional the depth of corruption and womanly degradation is reached. There the seeds of hell are planted in the soul. The thoughts of a young girl are polluted. Her heart is polluted, her mind becomes familiarized with the most revolting sins of impurity. The lessons engraved in the memory, the heart, the thought, the soul, like the sear of a red-hot iron, leaves its scar. In the confessional young unmarried and married women get accustomed to hear and repeat without a scruple things which would cause even a fallen woman to blush.' These are the words of one who has been through the above and escaped from their murderous hands. I will close with the above. It is a clincher and positive evidence and witness of all I have said. All unite with me in prayer that the above will open the eyes of many deceived Romanists and come to the blood of Christ.

"N. L. A. EASTMAN."

If this paper is not of an indecent character and within the prohibition of the statute, then it is impossible, as I think, to conceive of any printed matter that would be. It would seem to be a work of supererogation to argue, or to cite authorities, in support of the proposition that a writing so vile and nasty as this appears to be is of an indecent character; but since there appears to be some difference of opinion on the point, whether the writing is indecent or not, I will add that no court has ever held that such a publication could be anything but indecent, at least all the decisions, as I understand them, hold that such a paper is an indecent publication.

Judge ANDREWS, in *People* v. *Muller* (96 N. Y. 408), in speaking of section 317, says: "The words used in the statute are themselves descriptive. They are words in common use and every person of ordinary intelligence understands their meaning and, readily and in most cases accurately, applies them to any subject or thing brought to his attention which involves a judgment as to the quality indicated. It does not require an expert in art or literature to determine whether a picture is obscene or indecent, or whether printed words are offensive to decency and good morals." Reading the article in question and then applying the common-sense test laid down by Judge ANDREWS, it is difficult to see how it could be better defined than as an indecent publication. A few definitions may, however, be given of the word "indecent" used by the lexicographers. Worcester defines it as something "unbecoming! unfit for the eyes or ears." The Century Dictionary defines it as that which is "obscene or grossly vulgar; unbecoming, unseemly, violating propriety of language, behavior, etc." The Imperial Dictionary defines it as "that which is unbecoming in language, actions or manners." In the case of *United States* v. *Loftus* (12 Fed. Rep. 671) the opinion states that the term "indecent" signifies "more than indelicate, and less than immodest;" that it means "something unfit for the eye or ear."

In reading this statute there may be some danger of falling into the error of construing " indecent " as synonymous with " lewd, lascivious," etc., used in connection with it, but an examination of the language of the section, from its appearance in the original Code of 1881 to the present time, clearly discloses that the word does not necessarily have any reference to morals. The prohibition is against an " obscene or indecent " publication.

In *Reg* v. *Hicklin* (L. R. [3 Q. B.] 360) the defendant was charged with misdemeanor for selling a book entitled " The Confessional Unmasked; showing the depravity of the Romish Priesthood, the iniquity of the Confessional and the questions put to females in Confession." Cockburn, C. J., writing the opinion sustaining the charge, says: " The very reason why this work is put forward to expose the practices of the Roman Catholic Confessional is the tendency of questions, involving practices and propensities of a certain description, to do mischief in the minds of those to whom such questions are addressed, by suggesting thoughts and desires which otherwise would not have occurred to their minds. If that be the case between the priest and the person confessing, it manifestly must equally be so when the whole is put into the shape of a series of paragraphs, one following upon another, each involving some impure practices, some of them of the most filthy, disgusting and unnatural description it is possible to imagine. * * * We have it, therefore, that the publication itself is a breach of the law." It would seem to be impossible to distinguish that case from the one at bar.

In *Steel* v. *Brannan* (L. R. [7 Com. Pl.]——) the question was involved as to the defendant's guilt for having dealt in printed matter purporting to be extracts from works of Roman Catholic divines and casuists on the subject of the confessional. A conviction of misdemeanor having been had before a police magistrate the case came on review to the Common Pleas. The

appellant's counsel asked: "What effectual remedy is there in the hands of persons wishing to suppress a system which they conceive to be pernicious, except to expose the tendency of such a system?" To this BOVILL, C. J., answered: "There is no doubt that all matters of importance to society may be made the subject of full and free discussion, but while the liberty of such discussion is preserved, it must not 'be allowed to run into obscenity and to be conducted in a manner which tends to corrupt the public morals. The probable effect of the publication of this book being prejudicial to public morality and decency, the appellant must be taken to have intended the natural consequences of such publication, even though the book were published with the object referred to by counsel. * * * Discussions offensive to public decency and of a depraving tendency are not privileged."

In *United States* v. *Bennett* (16 Blatchford, 338), Judge BLATCHFORD refers with approval to the language of Judge CLARK in charging the jury in the *Haywood* case as follows: "*A book is indecent which is unbecoming, immodest, unfit to be seen.* A book which is obscene, as I have said to you before, or lewd, or lascivious, or indecent, in whole or in part, or in its general scope or tendency, in its plates or pictures, or in its reading matter, falls within the scope of the prohibition of the statute."

Judge DANIELS, in *People* v. *Muller* (32 Hun, 209), says: "The statute has not particularly described what, within its intent and purpose, should be considered obscene or indecent. But as these words are words of well-known significance, it must have been intended by the legislature, in the enactment of this law, to use them in their popular sense and understanding. * * * And as the statute has given this general definition of the character of the acts constituting the offense, it must necessarily have been designed that the drawing, picture, photograph or writing should be exhibited to and observed

by the jury for them to determine as a matter of fact, in the exercise of their good sense and judgment, whether or not they were obscene and indecent. * * * The question in all of these cases must be, what is the impression produced upon the minds by perusing or observing the writing or picture referred to in the indictment, and one person is as competent to determine that as another."

The only question presented by the demurrer in this case is whether the writing in question is, as matter of law, *not* indecent. In all the cases where the question has arisen it was held that the writing or picture must be submitted to the jury to decide whether in fact it was indecent or not; that the words used in the statute are in themselves descriptive, to be taken and understood in the popular sense and that upon such a question the opinion of one person is just as good as that of another. This court is asked to hold, as matter of law, that the writing, upon reading and inspection, is not an indecent publication. That, as it seems to me, is a question of fact which must be determined by the jury, under proper instructions. The character of the writing, its tendency and effect, is a question that one person is as competent to decide as another, and hence it cannot be said, as matter of law, that it is not within the prohibition of the statute.

In *United States* v. *Bebout* (28 Fed. Rep. 522) the defendant was indicted under a Federal statute against " publications of an indecent character." The trial judge in charging the jury defined the term " indecent " as something " not decent; unfit to be seen or heard." He then said: " There is a test which has often been applied and approved of by the courts in this class of cases to determine whether the publication is obscene or indecent within the meaning of the statute before referred to. It is whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this sort may fall. Under

these definitions, whether the matter set out in the indictment was obscene or indecent, is a question of fact for you to determine."

I am, therefore, unable to concur in the views of the majority. It is true that my brethren have considered it necessary to denounce the publication in question upon almost every conceivable ground of impropriety, except the ground which presents the only question before the court, that it is an indecent publication within the statute. The paper has been characterized by very harsh names that do not, in the least, solve the only question presented by the appeal. Having arrived at the conclusion that it is not an indecent publication, it is of very little consequence what else it may be. The important feature of the case is that, notwithstanding the conceded iniquity found in the writing, the defendant, by what appears to me to be a very strained and artificial construction of his act, is allowed to escape punishment; nor is the situation helped very much by the suggestion that the paper is a criminal libel and that the public prosecutor should have indicted the defendant for that crime instead of the one charged in the indictment. The defendant is not injured very much by the suggestion that he has published a libel instead of an indecent paper; since we all know that he may now be protected by the Statute of Limitations from any prosecution on such a charge.

The judgment should be reversed and the demurrer overruled.

EDWARD T. BARTLETT, VANN, HISCOCK and CHASE, JJ., concur with per curiam opinion, and CULLEN, Ch. J.; HAIGHT, J., concurs with O'BRIEN, J.

Judgment affirmed.

## NOTE:—WHAT IS AN INDECENT OR OBSCENE PRINT OR PUBLICATION.

It is the policy of the law to prevent the circulation of indecent, obscene, lewd, and lascivious printed matter of every sort, on the ground of its tendency to corrupt the young and those who are susceptible to such influences. For that purpose, section 317 of the N. Y. Penal Code was enacted. To determine what is an indecent or obscene print or publication within the meaning of statutes prohibiting their circulation and sale, is a difficult question to answer. The construction of the terms "obscene," indecent," "lewd," and "lascivious," as applied to matter deposited in the mails, is well settled. See topic Mailable Matter, *infra.*

### QUESTIONS FOR COURT AND JURY.

The question whether the matter published is indecent and obscene, was held in the following cases to be one of law: McNair v. People, 89 Ill. 441; Smith v. State, 24 Tex. Ct. App. 1; State v. McKee, 73 Conn. 18; Swearingen v. U. S., 161 U. S. 446.

But in the following cases the obscenity was considered a question of fact for the jury: People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375; State v. Van Wye, 136 Mo. 229; Com. v. Landis, 8 Phila. (Pa.) 453; U. S. v. Davis, 38 Fed. 326; U. S. v. Clarke, 38 Fed. 500; But see, U. S. v. Smith, 45 Fed. 476.

In Com. v. Landis, 8 Phila. (Pa.) 453, the court said that obscenity is determined by the common sense and feelings of mankind, and not by the skill of the learned, and therefore the character of a publication is a question for the jury to be determined by their examination of the publication.

### EXPERT OPINION.

"It does not require an expert in art or literature," said the court in People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375, " to determine whether a picture is obscene or whether printed words are offensive to decency and good morals. These are matters which fall within the range of ordinary intelligence, and a jury does not require to be informed by an expert before pronouncing upon them."

### EFFECT OF INTENT.

The intent of a person in selling a picture claimed to be indecent and obscene was held in People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375, to be immaterial, since the object of the statute is to suppress the traffic in obscene publications and to protect the community

against the contamination and pollution arising from their exhibition and distribution.

The purpose or motive of the writer in mailing obscene matter is immaterial. It is the matter that governs not the motive. It is what the writer says and not why he says it. U. S. v. Britton, 17 Fed. 731.

### SIMILAR PRINTS OR PUBLICATIONS.

The fact that similar pictures were used in commerce or trade, was held in State v. Ulsemer, 24 Wash. 657, not to palliate the offense of one charged with the circulation of indecent pictures.

And in People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375, the court said that the fact that the original pictures of which the photographs (which the defendant was charged with selling) were copies, had been exhibited in the Salon in Paris did not, as matter of law, exclude a finding by the jury that the photographs were obscene and indecent; and the fact that a picture had been publicly exhibited would not necessarily determine its character as decent or indecent.

### SCIENTIFIC PUBLICATIONS.

Scientific and medical publications containing illustrations exhibiting the human form, if wantonly exposed in the open markets with a wicked desire to create a demand for them, and not to promote the good of society, would, if tending to excite lewd desires, be regarded as obscene publications. Com. v. Landis, 8 Phila. (Pa.) 453.

" Whether a publication is obscene or not," said the court in People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375, " may in some cases depend on circumstances. For example, a medical book for the instruction of medical men may contain illustrations suitable and proper as a part of the work, but which, if detached and published alone for circulation, might be deemed indecent within the statute."

Where the acts described and the ideas conveyed in a book are calculated to deprave the morals of the reader by exciting sexual desires, such a book was held in Burton v. U. S., 142 Fed. 57, to be obscene, under U. S. Rev. statute, section 3893; forbidding the mailing of obscene, lewd, and lascivious matter, and it is immaterial that the information conveyed is accurate and scientific and tends to prevent disease and other ills resulting from ignorance, and that the book as a whole is calculated to be of value to the practitioner of medicine and to men and women in the marriage relation.

### WORKS OF ART AND LITERATURE.

In People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375, the court, speaking of works of art, said: " It is evident that mere nudity in

painting and sculpture is not obscenity. Some of the great works in painting and sculpture as all know represent nude human forms. It is a false delicacy and mere prudery which would condemn and banish from sight all such objects as obscene, simply on account of their nudity. If the test of obscenity or indecency in a picture or statue is its capability of suggesting impure thoughts, then indeed all such representations might be considered as indecent or obscene. The presence of a woman of the purest character and of the most modest behavior and bearing may suggest to a prurient imagination images of lust, and excite impure desires, and so may a picture or statue not in fact indecent or obscene. * * * A proper test of obscenity in a painting or statue (is) whether the motive of the painting or statue, so to speak, as indicated by it, is pure or impure, whether it is naturally calculated to excite in a spectator impure imaginations, and whether the other incidents and qualities, however attractive, were merely accessory to this as the primary or main purpose of the representation."

But rare and expensive copies of Payne's edition of the Arabian Nights, Fielding's novel of Tom Jones, the works of Rabelais, Ovid's Art of Love, the Decameron of Boccaccio, the Heptameron of Queen Margaret of Navarre, the Confessions of J. J. Rousseau, Tales from the Arabic, and Alladin, which were among the assets of a bankrupt concern, were regarded in Matter of Worthington Co., 30 N. Y. Supp. 361, as of too great value as literature and specimens of fine book binding to be destroyed, on the ground that they were obscene and immoral, since such books were not likely to fall into the hands of those who would be subject to their influence.

## MISCELLANEOUS PUBLICATIONS, ETC.

A Sunday newspaper, devoted mainly to the publication of scandals, whorings, lechery, assignation, intrigues between men and women, and immoral conduct of people in general, was regarded in State v. Van Wye, 136 Mo. 227, to be an immoral publication within the meaning of a Missouri statute declaring one who disseminates a paper devoted to publication of scandal, immoral conduct, etc., shall be guilty of a felony.

The circulation and sale in Kansas of the newspaper mentioned in the preceding case, was held in Re Banks, 56 Kan. 242, to come within the purview of a Kansas statute (Chap. 161, Laws 1891) which forbids the circulation and sale of newspapers devoted largely to scandal, lechery, etc. The court held that the terms " devoted largely," do not mean any definite number of columns, but it is sufficient if the indecent matter is a prominent feature, and especially characteristic of the publication.

17

The gist of the offense committed by a violation of Conn. Public Acts, 1895, P. 558, prohibiting the sale, or offering for sale, of papers, books, or magazines devoted to the publication of criminal news, police reports, and pictures or stories of crime, was held in State v. McKee, 73 Conn. 18, to be the massing of such immoralities in one publication, whatever the motive, and that the paper is mainly devoted to such matters.

In People v. Eastman, 21 N. Y. Crim. Rep. *supra,* it was held that a publication attacking the Catholic Church, although vile, scurrilous and reprehensible, was not indecent within sect. 317 of the N. Y. Penal Code, unless it is lewd and has a tendency to excite lustful and lecherous desires. The article in question is set out in the dissenting opinion. The dissenting opinion also contains a discussion of numerous authorities on the subject of what is an indecent or obscene publication.

Cutting the words " ass hole work " in the back of a church seat, was held in Smith v. State, 24 Tex. Ct. App. 1, to be an indecent publication.

A photograph taken of nude women, and afterwards delivered to them for pay, was held in State v. Doty, 103 Iowa 699, to be indecent and obscene within the meaning of a statute (sect. 1, chap. 177, Acts Twenty-first Gen. Assembly) forbidding the gift or sale of indecent books, pictures, photographs, etc.

By their verdict of guilty, the jury in People v. Muller, 96 N. Y. 408, 2 N. Y. Crim. Rep. 375, affirming 32 Hun, 209, 2 N. Y. Crim. Rep. 279, necessarily found that certain photographic copies of paintings, among which were " La Asphyxie," " After the Bath," and " La Baigneuse," representing nude females, sold by the defendant, were obscene and indecent within sect. 317 of the Penal Code which prohibits the sale of an obscene or an indecent book, writing, paper, picture, drawing, or photograph.

Certain pictures illustrating the supposed evil effects of drinking a certain company's beer, and the good effects of drinking another brand, were regarded in State v. Pfenninger, 76 Mo. App. 313, to be vulgar, foul and obscene.

But a letter written to a young woman 21 years of age, as follows:— " Stay with me after school. I have secured a powder through the mail that will make you safe," and shown to no one but her, was held in Edwards v. State, (Tex. Crim. App.) 85 S. W. 797, as not manifestly designed to corrupt the morals of youth, within Art. 365 of the Texas Penal Code, 1895, which prohibits the making, publishing or

printing of any indecent and obscene print or picture, manifestly designed to corrupt the morals of youth, since the young woman was not a " youth " within the contemplation of the statute.

## SUFFICIENCY OF INDICTMENT.

It may fairly be said to be the settled rule that it is not necessary to set out matter in an indictment which the grand jury asserts to be too obscene for recital. It is only necessary to identify the obscene book or publication sufficiently to appraise the defendant of what particular book is intended, and to aver its obscenity, giving as an excuse for not setting forth the obscene matter that it is so gross as to be offensive to the court and improper to be placed upon its records. People v. Kaufman, 14 App. Div. 305; State v. Smith, 17 R. I. 371; State v. Brown, 27 Vt. 619; McNair v. People, 89 Ill. 441; Com. v. Holmes, 17 Mass. 336; Com. v. Sharpless, 2 Serg. & Rawle (Pa.) 91; People v. Van Wye, 136 Mo. 227; People v. Zurhorst, 75 Ohio St. 232; U. S. v. Bennett, 16 Blatch. 338. (See cases reviewed in opinion therein); Rosen v. U. S. 161 U. S. 29; Price v. U. S. 165 U. S. 311.

But in the following cases the indictment for uttering obscene prints, did not sufficiently describe them: People v. Hallenbeck, 2 Abb. N. C. 66; People v. Danihy, 63 Hun, 579.

In People v. Danihy, 63 Hun, 579, the indictment was held to be demurrable for failure to set out any portion of the matter alleged to be obscene, lewd and indecent, instead of describing it specifically. The point of distinction between this case and People v. Kaufman, *supra,* is pointed out in the latter as the omission of the indictment in the former to state that the obscene matter was of too gross a character to be placed upon the records.

## MAILABLE MATTER—THE TEST.

It not infrequently becomes necessary to determine the character of an article, publication, picture, etc, in prosecutions for depositing obscene, lewd and lascivious matter in the Post Office, in violation of U. S. Rev. Statute, section 3893, which declares that " every obscene, lewd, or lascivious book, pamphlet, picture, paper, writing, or other publication of an indecent character . . . are hereby declared to be nonmailable matter."

The words " obscene," " lewd," and " lascivious," as used in this statute, were construed in Swearingen v. U. S., 161 U. S. 446, as signifying that form of immorality which has relation to sexual impurity, and have the same meaning as given them at common law in prosecutions for obscene libel, and therefore do not extend to language, although it may be exceedingly coarse, vulgar and plainly libelous, if

it has not a lewd, lascivious and obscene tendency calculated to corrupt and debauch the mind and morals. The article in question is added on page 447, at the suggestion of one of the dissenting judges.

In this connection, see also, U. S. v. Bennett, 16 Blatch. 338 (a portion of which appears as a footnote in 2 N. Y. Crim. Rep. 284), which is one of the leading authorities on the subject. In this case the test was laid down as follows: It is whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this kind may fall. This test was applied in U. S. v. Bebont, 28 Fed. 522.

"It is not a question," said the court in U. S. v. Britton, 17 Fed. 731, "whether it (the publication) would corrupt the morals of every person. * * * It is within the law if it would suggest impure and libidinous thoughts in the minds of the young and the inexperienced."

In U. S. v. Clarke, 38 Fed. 500, the court held that the words "obscene," "lewd," lascivious," and "indecent," as used in the U. S. statute have the same meaning as given them at common law in prosecutions for obscene libel.

The term "obscene" was defined in U. S. v. Martin, 50 Fed. 918, as that which is offensive to chastity and modesty.

Matter is "obscene" within the meaning of the U. S. statute when it is offensive to the common sense of decency and modesty of the community, and is of such a character as to deprave and corrupt those whose minds are open to such immoral influences. U. S. v. Harmon, 45 Fed. 414. A similar definition is given in U. S. v. Slenker, 32 Fed. 691.

A "lewd" book or paper within the U. S. statute was defined in U. S. v. Clarke, 38 Fed. 732, as one that describes dissolute or unchaste acts, scenes, or incidents, or the reading of which, by reason of its contents, is calculated to excite lustful and sensual desires in those whose minds are open to such influences. Same test applied in U. S. v. Wyatt, 122 Fed. 316.

It is not essential to the commission of the offense prescribed in U. S. Rev. Statute, section 3893, that the entire contents of the publication deposited in the mails be objectionable in character. Demolli v. U. S., 144 Fed. 363; U. S. v. Clarke, 38 Fed. 732.

### APPLICATION OF TEST—MAILABLE.
Written matter which is coarse, unbecoming, or even profane, was held in U. S. v. Smith, 11 Fed. 663, not to fall within the inhibition

of the statute. The letter in question stated " —fully developed you to me as a d—n scoundrel and rascal."

So, matter written on 'the edge of a valentine, stating: " you can keep this to wipe your dirty a— on, and spend your money to pay your debts, or have your picture taken again in men's clothing," was held in U. S. v. Males, 51 Fed. 41, not to be " obscene, lewd or lascivious " within the meaning of the statute.

A libelous letter imputing to the addressee an atrocious crime, but which has no tendency to excite libidinous thoughts or impure desires, or to deprave or to corrupt the morals of those whose minds are open to such influences, was held in U. S. v. Wightman, 29 Fed. 636, not to be " obscene, lewd, or lascivious," within the meaning of the Federal statute.

An article attacking the doctrine of the immaculate conception of Christ, does not fall within the purview of U. S. Rev. Statute, section 3893, because coarse or even obscene language is employed, where it has no tendency to induce sexual immorality. U. S. v. Moore, 104 Fed. 78.

See U. S. v. Wroblenski, 118 Fed. 495, with reference to the mailing of a private letter directed to and containing indecent charges against the writer's mother, as a violation of the Federal statute.

See also U. S. v. Lamkin, 73 Fed. 459, *infra,* with reference to a letter sent to obtain a meeting for immoral purposes.

—NON MAILABLE.

But a letter written by a married man to a married woman he had never met, stating that he hoped the letter would come to her as a ray of sunshine on a cloudy day, that if she cared to meet him no one would ever know it, that they could pass pleasant afternoons together, as there was an old lady he knew of who keeps rooms to rent for such meetings. The letter directed the recipient to go where this lady lived and tell her that she (the recipient) wished to meet a " gentleman friend " there, about twice a week. The letter further requested her to go to this place, sit in the front window with her hat on, so that the writer would know that she was there and wanted to see him, and that he would come up the opposite side of the street and tip his hat when he saw her, so that she would recognize him, and so meet him at the top of the stairs. This letter was held in U. S. v. Moore, 129 Fed. 159, to be obscene within the meaning of the Federal statute, as the purpose of the letter was an invitation and solicitation to meet the writer for sexual intercourse.

And in U. S. v. Martin, 50 Fed. 918, the letter was. written by a

married man to an unmarried woman, the substance of which was an invitation by him to take her on a trip the expense of which he would pay and give her five dollars besides, with the suggestion that, " if you will go, I will promise you a nice time." This letter was construed to be lewd and obscene within the statute.

But a series of letters which do not contain lewd or indecent language, but sent for the purpose of seduction or to obtain a meeting for immoral purpose, were held in U. S. v. Lamkin, 73 Fed. 459, not to come within the purview of the statute. The letters appear in the statement of fact.

An article containing in suggestive language a description of the physical appearance of the " Ripe Woman," and of the writer's idea of the thoughts excited thereby; also a description, in coarse, rude terms, of the " Unripe Woman," with a reference to unnatural practices and crimes, as among the causes for her condition; and an advertisement, one of which extolled the merits of a certain remedy for venereal diseases, and the other addressed to the " Ladies of the Tenderloin District," calling their attention to the writer's stock of a certain line of goods, was held in U. S. v. Jones, 74 Fed. 545, to be " obscene matter."

See Dunlop v. U. S., 165 U. S. 486, for obscene " personals " in a newspaper advertising " baths," etc.