UNITED STATES v. KLAUDER.

(District Court, N. D. New York. March 31, 1917.)

1. POST OFFICE ⬿31—OFFENSES—NONMAILABLE MATTER.
   Cr. Code (Act March 4, 1909, c. 321, 35 Stat. 1129) § 211, as amended by Act March 4, 1911, c. 241, § 2, 36 Stat. 1339 (Comp. St. 1913, § 10381), declaring that every obscene, lewd, or lascivious, and every filthy book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character shall be nonmailable, and whoever shall knowingly deposit or cause to be deposited for mailing or delivery anything declared to be nonmailable shall be punished, written matter which is merely abusive, scandalous, scurrilous, improper, vulgar, or even libelous, does not fall within the prohibition of the statute; but, if the language used must have or may have an immoral effect upon those into whose hands it may come, it is within the statute.
   [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 50, 52.]

2. POST OFFICE ⬿31—OFFENSES—NONMAILABLE MATTER.
   For matter to be nonmailable it is not essential that the entire contents of the writing fall within the statute.
   [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 50, 52.]

3. POST OFFICE ⬿50—OFFENSES—NONMAILABLE MATTER.
   A paper charging priests with many and varied sexual immoralities, which described the amorous exploits of one priest, cannot as a matter of law be held to fall without the statute so as to be mailable; the paper by its descriptions tending to provoke libidinous thoughts in the reader, this being so, the purpose of the article was merely to attack the character of the priests.
   [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89.]

4. INDICTMENT AND INFORMATION ⬿150—DEMURRER—QUESTION CONSIDERED.
   On demurrer to an indictment charging defendant with sending through the mails nonmailable matter, the court can only decide whether the matter is so clearly innocent that the question should not be submitted to the jury.
   [Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 497.]

At Law. Alexander L. A. Klauder was indicted for violating Cr. Code, § 211, as amended by Act March 4, 1911, § 2 (Comp. St. 1913,

§ 10381), in sending through the mails nonmailable matter. On de-, murrer to the indictment. Demurrer overruled.

Demurrer to indictment charging that the defendant deposited in the mails of the United States knowingly for mailing a certain printed paper or publication alleged to be obscene and lewd. The defendant demurs on the ground the articles contained in such printed paper or publication alleged to have been sent through the mails and filed with and as a part of the indictment are not obscene or lewd and fails to show the commission of the crime charged, or any crime.

D. B. Lucey, U. S. Atty., of Ogdensburg, N. Y.
R. M. Moore, of New York City, for defendant.

RAY, District Judge. The paper in question of which the defendant was editor and manager was quite extensively circulated through the mails by the defendant, and same is clearly scandalous and libelous and unfit for circulation or to be read in any family. It is an attack upon certain bishops and fathers of the church and an attorney of this court also. The question is whether or not any part of the article, which seems to be a continuous statement, attacking first one and then another by name and repeatedly charging illegitimate sexual acts and immorality, is within section 211 of the Criminal Code as amended by the Act of March 4, 1911, c. 241, § 2 (Comp. St. 1913, § 10381), and which declares that:

"Every obscene, lewd, or lascivious, and every filthy book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character * * * is hereby declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office, or by any letter carrier. Whoever shall knowingly deposit, or cause to be deposited for mailing or delivery, anything declared by this section to be nonmailable * * * shall be fined," etc.

[1] It has been repeatedly held that written letters or printed or written matter which are merely abusive, scandalous, scurrilous, improper, intemperate, unjustifiable, offensive, vulgar, or highly reprehensible, or even libelous, are not within the prohibition of this statute. See Swearingen v. U. S., 161 U. S. 446, 16 Sup. Ct. 562, 40 L. Ed. 765; U. S. v. O'Donnell (C. C.) 165 Fed. 218; People v. Eastman, 188 N. Y. 478, 81 N. E. 459, 11 Ann. Cas. 302.

If the language used must have or may have an immoral effect, in a sense relating to sexual impurity, upon those into whose hands it may come, it was held in U. S. v. Benedict (C. C.) 165 Fed. 221, that the paper is within the statute. In Burton v. U. S., 142 Fed. 57, 73 C. C. A. 243, it was held that, where the acts described and the ideas conveyed in a book were calculated to deprave the morals of the reader by exciting sensual desires and libidinous thoughts, the book was obscene. In U. S. v. Musgrave (D. C.) 160 Fed. 700, it was held it is sufficient, if the reading would in the opinion of reasonable persons tend to deprave or corrupt the morals of reasonable persons, and would suggest to the minds of either sex thoughts of an impure or libidinous character.

[2] It is not essential that the entire contents of the paper be within the statute. Demolli v. U. S., 144 Fed. 363, 75 C. C. A. 365, 6 L. R. A. (N. S.) 424, 7 Ann. Cas. 121; U. S. v. Harman (D. C.) 38 Fed. 827.

[3] Omitting names and places, it may be well to quote some of the language found in the printed paper sent out through the mails by the defendant:

"Now ———— is a well known dyed-in-the-wool criminal priest. * * * Then he is charged also with the seduction of a young girl. * * * He has been free to drink, to rape and to rob at his heart's content with the odds of being simply transferred to another charge in substitution of some sick or absent pastor. * * * At ———— where he substituted for a while, he assaulted a young married woman, annoyed her with his frequent visits and lecherous attentions and was constantly trying to fix dates with her. At ———— he annoyed another married woman as well as her daughters, all handsome young women, until the father ordered him from the house. * * * He finally left there with his old reputation of leaving a helpless pregnant girl behind him."

Again:

"But at the same time to find a place for ————, the criminal priest of ————, who was thrown out of the house of a married woman by her aggrieved husband, has assaulted another woman in the confessional. * * * He has the reputation in the village of being a monster of unnatural and unmentionable vices. The worst stories of his solicitation and assaults upon young men are told in his community. With this man young boys are not considered safe. * * * His house is famous for its nocturnal orgies where a company of young men and boys are accustomed to smoke, drink and play cards with the zealous pastor. His bed associations are the vile talk of the shops and stores."

Again:

"Two brilliant and popular men, yet with a reputation of common rakes and debauchees. If ———— has his mistresses, and his nocturnal visits in ———— are well known and scored by the citizens of that city, the exploits of ————. go his master even one better. Transferred from ———— to ———— as an absolute necessity on account of his scandalous associations with the opposite sex; his well-known visits to the tenderloin, where the most obscene talk follows his orgies there; his life at ———— is again assailed on account of the female company he keeps there in his very rectory against the statutes of the diocese and the plain demands of ecclesiastical discipline and propriety. And now he takes the same young woman, who has been the occasion of so much talk, with him to ———— and the history of his irregular and erratic exploits follow him from parish to parish. The mother of this young woman is heart-broken over ———— intimacy with her daughter and pleaded in vain with her not to accompany him to ————. * * * He himself gave away the criminal alliance of his immediate predecessor with a married woman to be accused himself of a similar scandal. He knows that adultery, rape, abortion and even murder are laid to the door of his rectory. * * * A local druggist has since confessed that he had sold more drugs for the prevention of childbirth to that priest than to any other customer."

And again:

"On another occasion he paid a visit to a summer resort up in the ———— mountains. It happened in this way: One evening a woman, unattended, called at the hotel. She claimed that her husband was a traveling man and would be along the next day. The next day, sure enough, the would-be husband and traveling man arrived. But the clerk whispered to the proprietor that the man was neither a married man nor a traveling man. 'Why,' said he, 'that is Father ———— of ————. I live in the same village and know him well.' The following day when ———— came to pay his bill he was told that

it would be $15.00. M——— made eyes and protested against the exorbitant charge. But the proprietor informed him of the kind of place he kept and that those who abused it would have to pay a fine or be exposed. When the woman came along she was also soaked to the tune of $15.00. M——— paid the $30.00 without further protest and was glad to get away with the feeling of a korkscrew pulling at his gizzard and with the hope that the luckless exploit would never get any further. * * * A hackman of ——— tells the tale how M——— came to him one evening with two young priests and told him to give the poor young fellows a good time. How he was directed to the house of some young girls whom the priests took to a halfway house and spent the rest of the night with them there."

Again:

"His continual nocturnal absence and late morning returns were liable to make the impression that the poor man (referring to a father of the church) was out day and night looking after the sick and the care of souls. But later developments in the study of his career explain this mystery of his nocturnal activities and of his limp and exhausted condition following his nocturnal avocations."

These are some of the many statements. It seems to me clear that, while these statements printed in the paper referred to and circulated through the mails are of a nature to create a feeling of disgust with some, they are at the same time clearly calculated and worded by their frequent reference to illicit sexual intercourse to fix the mind and thought of very many of the readers on such matters and excite sexual thoughts and desires. If some of these statements are not obscene and lewd and of an indecent character, it is difficult to imagine or describe what would be. True, vile and nasty words are not used; but the offense condemned by the statute is, not the use of nasty or filthy words or expressions, but the use of obscene and lewd or lascivious words and phrases.

One paragraph above quoted after referring to the "continual nocturnal absence and late morning returns" of the priest referred to, and stating that this might give rise to the thought that he was out looking after the spiritual welfare of some of his parishioners, plainly negatives that such was the purpose of such nightly absences and as plainly indicates and charges that such nocturnal absences were for the purpose of illicit sexual intercourse and that the person referred to had indulged therein. If this is not lewd and obscene, what is? Was it necessary that the printed article go more into detail?

In U. S. v. Clark (D. C.) 38 Fed. 732, a "lewd book, pamphlet, or paper" is defined as one which describes dissolute, unchaste acts, the reading whereof by reason of its contents is calculated to excite lustful and sexual desires in those whose minds are open to such influences. See, also, Burton v. U. S., 142 Fed. 57, 63, 73 C. C. A. 243. The description of the visit of the woman to the hotel under false pretenses, of the coming of the priest under an assumed name, the exorbitant charge made by the proprietor because of the purpose of the overnight visit of the two plainly indicated and suggested, and the reluctant payment of such charge by the man concerned, suggest to those whose minds are that way at all inclined the feasibility of such transactions and suggest and necessarily awaken libidinous thoughts and sexual desires. The minds of all readers are fixed on that subject for the

time being.   Reading such articles does not improve or benefit any one, and with very many the effect is seriously harmful.   It seems to me unnecessary to comment on the other quotations.   The most of the printed matter in the paper complained of is quite different from that found set out in full in People v. Eastman, 188 N. Y. 478, at pages 482, 484, 81 N. E. 459, 11 Ann. Cas. 302.

In Tyomies Pub. Co. et al. v. U. S., 211 Fed. 385, 390, 128 C. C. A. 47, 52, it is said:

"The words 'obscene, lewd, and lascivious,' as used in the statute, signify that form of immorality which has relation to sexual impurity"—citing Swearingen v. U. S., 161 U. S. 446, 16 Sup. Ct. 562, 40 L. Ed. 765; U. S. v. O'Donnell (C. C.) 165 Fed. 218; U. S. v. Benedict (C. C.) 165 Fed. 221; Konda v. U. S., 166 Fed. 91, 92 C. C. A. 75, 22 L. R. A. (N. S.) 304.

The quotation from the paper set out as a part of the indictment in this case repeatedly refers to and plainly describes and charges illegitimate sexual acts and intercourse.   In truth, from the beginning to the ending of the paper the mind of the reader is kept upon that subject.   The sexual indulgences of the priests referred to by name are made to stand out glaringly.   See, also, MacFadden v. U. S., 165 Fed. 51, 91 C. C. A. 89.

I am unable to see that the paper referred to in the indictment and from which the quotations given are taken is not within the condemnation of the statute.   At least, the language quoted presents a question of fact for a jury.   It is true that the purpose of the writer and mailer of the articles in this paper was to scandalize the persons mentioned, and not to awaken sexual thoughts and desires; but the statute does not concern itself with motives.

[4] On demurrer the court has only power to decide whether the book or paper or letter is so clearly innocent that a jury should not pass on it at all.   U. S. v. Kennerley (D. C.) 209 Fed. 119.   That cannot be said in this case.

The demurrer is overruled.