## Commonwealth v. Gordon et al.

*John H. Maurer*, district attorney, *Franklin E. Barr* and *John F. Kane*, assistant district attorneys, for Commonwealth.

*Thomas D. McBride* and *M. Phillip Freed*, for defendants.

Bok, J., March 18, 1949.—This is a trial without jury, all defendants having signed waivers on all indictments.

The evidence consists of nine books and an oral stipulation at bar that defendants are booksellers and that they possessed the books with the intent to sell them on the dates and at the times and places set forth in the indictments. This constituted in full the Commonwealth's evidence, to which defendants have demurred.

I have read the books with thoughtful care and find that they are not obscene, as alleged. The demurrers are therefore sustained.

## The Statute

The indictments are drawn under section 524 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §4524, which reads as follows:

"Whoever sells, lends, distributes, exhibits, gives away, or shows or offers to sell, lend, distribute, exhibit, or give away or show, or has in his possession with intent to sell, lend, distribute or give away or to show, or knowingly advertises in any manner, any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet, newspaper, storypaper, paper, writing, drawing, photograph, figure or image, or any written or printed matter of an indecent character, or any article or instrument of indecent or immoral use or purporting to be for indecent or immoral use or purpose, or whoever designs, copies, draws, photographs, prints, utters, publishes, or in any manner manufactures or prepares any such book, picture, drawing, magazine, pamphlet, newspaper, storypaper, paper, writing, figure, image, matter, article or thing, or whoever writes, prints, publishes or utters, or causes to be printed, published or uttered, any advertisement or notice of any kind giving information, directly or indirectly, stating or purporting to do so, where, how, of whom, or by what means any, or what purports to be, any obscene, lewd, lascivious, filthy, disgusting or indecent book, picture, writing, paper, figure, image, matter, article or thing named in this section can be purchased, obtained or had, or whoever prints, utters, publishes, sells, lends, gives away, or shows, or has in his possession with intent to sell, lend, give away, or show, or otherwise offers for sale, loan or gift, or distribution, any pamphlet, magazine, newspaper or other printed paper devoted to the publication and principally made up of criminal news, police reports or accounts of criminal deeds, or pictures of stories of

deeds of bloodshed, lust or crime, or whoever hires, employs, uses or permits any minor or child to do or assist in doing any act or thing mentioned in this section, is guilty of a misdemeanor, and upon conviction, shall be sentenced to imprisonment not exceeding one (1) year, or to pay a fine not exceeding five hundred dollars ($500), or both."

The particular and only charge in the indictments is that defendants possessed some or all of the books with the intent to sell them.

Section 524, quoted above, is based upon the earlier Acts of May 6, 1887, P. L. 84, and May 12, 1897, P. L. 63, 18 PS §§780, 781 and 782, which are similar in scope and not essentially different in wording. The earliest and only other act is the Criminal Code of March 31, 1860, P. L. 382, sec. 40, 18 PS §779, which made it an offense to "publish or sell any filthy and obscene libel".

It should be noted at once that the wording of section 524 requires consideration of the indicted material as a whole; it does not proscribe articles or publications that merely contain obscene matter. This is now true in all jurisdictions that have dealt with the subject: the Federal courts, Swearingen v. United States, 161 U. S. 446 (1896); United States v. Ulysses, 72 F.(2d) 705 (1934); Walker v. Popenoe, 149 F.(2d) 511 (1945); Massachusetts, Commonwealth v. Isenstadt, 318 Mass. 543 (1945); New York, Halsey v. New York Society, 234 N. Y. 1, 136 N. E. 219 (1922); England, Regina v. Hicklin, L. R. 3 Q. B. 360 (1868).

It is also the rule in Pennsylvania. In Commonwealth v. New, 142 Pa. Superior Ct. 358 (1940), the court said:

"We have no fault to find with the statement that in determining whether a work is obscene, it must be construed as a whole and that *regard shall be had for its place in the arts*." (Italics supplied.)

### Résumé of the Opinion

Section 524, for all its verbiage, is very bare. The full weight of the legislative prohibition dangles from the word "obscene" and its synonyms. Nowhere are these words defined; nowhere is the danger to be expected of them stated; nowhere is a standard of judgment set forth. I assume that "obscenity" is expected to have a familiar and inherent meaning, both as to what it is and as to what it does.

It is my purpose to show that it has no such inherent meaning; that different meanings given to it at different times are not constant, either historically or legally; and that it is not constitutionally indictable unless it takes the form of sexual impurity, i. e., "dirt for dirt's sake" and can be traced to actual criminal behavior, either actual or demonstrably imminent.

### Résumé of the Books

1, 2 and 3. The Studs Lonigan trilogy ("Young Lonigan", "The Young Manhood of Studs Lonigan", "Judgment Day"), by James T. Farrell; Vanguard Press, 1932-1935.

This is the story of the moral and physical disintegration of a young man living in Chicago between the years 1916 and 1932. Nothing that he attempted ever quite came off, and his failures became more and more incisive. He left school to hang around the streets with others of his kind; he was too young to enlist for war service; he loved Lucy since they were in school together, but avoided her for four years and finally alienated her by making drunken advances to her; he worked for his father as a painter, but, on a casual tip, invested his savings in a dubious stock, which failed; he fell half-heartedly in love with Catherine, and they were engaged to be married, but she became pregnant by him before the ceremony; looking for a job on a

stormy day a few weeks before the wedding, he caught cold and died of pneumonia and a weakened heart.

The background of the semi-slum district in which Lonigan was born and lived was the outward counterpart of his own nature, and both together were too much for such decency of soul as he had. His drift downhill was relentless and inevitable. On the theory that no literature is vital that cannot be vulgarized, this trilogy may rank as an epic, for our criminal courts and prisons and many of our streets are peopled by Studs Lonigans. The characters in these books act and speak the kind of life that bred them, and Mr. Farrell has brought to the surface the groundswell of thought and inclination that move more people than, if they were honest, would admit to them.

It is not a pleasant story, nor are the characters gentle and refined. There is rape and dissipation and lust in these books, expressed in matching language, but they do not strike me as being out of proportion. The books as a whole create a sustained arc of a man's life and era, and the obvious effort of the author is to be faithful to the scene he depicts.

No one would want to be Studs Lonigan.

4. "A World I Never Made", by James T. Farrell; The Vanguard Press, New York, 1936.

This book could well be the beginning of another series, for it takes a minor character from the Lonigan books, Danny O'Neill, and shows him as a child. The milieu is the same—Chicago in 1911—but there is a discernible effort to show Danny's struggle uphill against the same factors that pushed Lonigan down.

This is the one book of the nine that does not end tragically; it merely stops in midstream, but the people who surround Danny do and say the same things that appear in the Lonigan series. Unlike the latter, this book is plastered with the short Saxon words of common vulgarity; they are consistent with the char-

acters who use them and with the quality of the lives and actions that are the subject of the author's scrutiny.

I am not of a mind, nor do I have the authority, to require an author to write about one kind of people and not about another, nor do I object to his effort to paint a complete picture of those whom he has chosen. Certainly I will not say that it is not a good thing to look deeply into life and people, regardless of the shadows that are to be found there.

5. "Sanctuary", by William Faulkner; Random House, 1931.

This is a powerful and dreadful story about a gay but virginal girl of 17 who accidentally falls into the hands of a sadistic man called Popeye, who is sexually impotent. He kills a half-witted boy who is informally guarding the girl, and ravishes her with a corncob. He then keeps her imprisoned in a house of prostitution and takes pleasure in watching her have intercourse with a man whom he kills when she tries to escape with him. Terrified of Popeye, she testifies that another man committed the murder, and is taken from court by her father, who has finally been able to locate her. Popeye is later apprehended on another charge of murder and is convicted.

There are no vulgar Saxon words in the book, but the situations are stark and unrelieved. It makes one shudder to think of what can happen by misadventure.

6. "Wild Palms", by William Faulkner; Random House, 1939.

This book concerns a wife who left her husband and children to seek integrity of experience, in terms of vitality, with her lover; "hunger is in the heart", she says, when the next meal seems uncertain, "not in the stomach". They wander about the country together, living as they must or as they wish, and she finally becomes pregnant. Her lover, a former doctor, at-

tempts to abort her but mishandles it and she dies. He pleads guilty and is sentenced to 50 years in prison. He refuses a gift of cyanide from the woman's husband, saying: "Between grief and nothing I will take grief".

The redeeming feature of this tale is that an acid loneliness comes through, the awful loneliness that pervades lost people, even in company. No one could envy these two miserable creatures.

7. "God's Little Acre", by Erskine Caldwell; Random House, 1933.

An able companion to the same author's "Tobacco Road", it is the story of a poor and illiterate farmer's family in Georgia. The central figure is the father, who for 15 years has dug holes in his farm in search of gold. God's Little Acre is a part of the farm which he mentally moves about in order to keep it from getting in the way of his search for treasure; his idea is to give all that comes from it to the church, but he never works it. His daughters and sons and their wives get variously tangled up in sexual affairs which are taken as being in the nature of things. One brother kills another over his wife. The final and despairing cry of the father, who has always tried to keep peace, is, "Blood on my land!"

It is a frank and turbulent story, but it is an obvious effort to be faithful to the locality and its people.

8. "End As a Man", by Calder Willingham; The Vanguard Press, 1947.

Life in a southern military academy. A drinking party and crooked poker game finally result in the expulsion of several cadets, including the wily and unmoral ringleader. The retired general in charge of the academy is the stereotype of military martinet, whose conception of the narrow and rigid discipline necessary to produce "a man" is set in bold relief against the energy of growing boys. The result is a fair picture of

the frustration inherent in an overdose of discipline and in the license and disobedience that is largely engendered by it.

No one would care to send his son to such an institution.

This is perhaps the foulest book of the lot, so far as language is concerned, but it is the language of vulgarity and not of erotic allurement.

9. "Never Love a Stranger", by Harold Robbins; Knopf, 1948.

The story of a boy brought up in an orphanage who finds that he has an uncle and is Jewish. After losing touch with his uncle he has various experiences and is finally down and out because he can find no work. He then becomes head of New York City's gambling racket, which he ultimately leaves in order to marry a childhood friend. She dies in childbirth and he is killed in the war; his friends take over the child, who will presumably have a better chance in life than he had.

It is a swift story that covers a great deal of ground, its point being to portray a hard and lonely man who could not fully trust or give himself to anyone. Its last and least convincing part is also the least open to attack for obscenity; the rest, particularly the section dealing with New York City during the depression of the early 1930's, is very moving, not because there are sexual incidents but because the lines of the story are deep and authentic.

### General Comment

Three of these books have already been judicially cleared in New York City.

"A World I Never Made" was before Magistrate Curran in 1937, under the caption of Bamberger v. The Vanguard Press, Inc., docket no. 329. The opinion was impromptu and is in the perceptive magistrate's best style.

"God's Little Acre" was the subject of People v. Viking Press, Inc., 147 N. Y. Misc. 813 (1933). In the course of his opinion Magistrate Greenspan said:

*"The Courts have strictly limited the applicability of the statute to works of pornography* and they have consistently declined to apply it to books of genuine literary value. If the statute were construed more broadly than in the manner just indicated, its effect would be to prevent altogether the realistic portrayal in literature of a large and important field of life. . . . The Court may not require the author to put refined language into the mouths of primitive people." (Italics supplied.)

Magistrate Strong held "End As a Man" not obscene in People v. Vanguard Press, 192 N. Y. Misc. 127 (1947), and observed:

"The speech of the characters must be considered in relation to its setting and the theme of the story. It seems clear that use of foul language will not of itself bring a novel or play within the condemnation of the statute."

After clearance by the magistrates, these books could have been brought before the grand jury, but no such indictments were attempted.

As I have indicated above, all but one of these books are profoundly tragic, and that one has its normal quota of frustration and despair. No one could envy or wish to emulate the characters that move so desolately through these pages. Far from inciting to lewd or lecherous desires, which are sensorially pleasurable, these books leave one either with a sense of horror or of pity for the degradation of mankind. The effect upon the normal reader, "l'homme moyen sensuel" (there is no such deft precision in English), would be anything but what the vice hunters fear it might be. We are so fearful for other people's morals; they so seldom have the courage of our own convictions.

It will be asked whether one would care to have one's young daughter read these books. I suppose that by the time she is old enough to wish to read them she will have learned the biologic facts of life and the words that go with them. There is something seriously wrong at home if those facts have not been met and faced and sorted by then; it is not children so much as parents that should receive our concern about this. I should prefer that my own three daughters meet the facts of life and the literature of the world in my library than behind a neighbor's barn, for I can face the adversary there directly. If the young ladies are appalled by what they read, they can close the book at the bottom of page one; if they read further, they will learn what is in the world and in its people, and no parents who have been discerning with their children need fear the outcome. Nor can they hold it back, for life is a series of little battles and minor issues, and the burden of choice is on us all, every day, young and old. Our daughters must live in the world and decide what sort of women they are to be, and we should be willing to prefer their deliberate and informed choice of decency rather than an innocence that continues to spring from ignorance. If that choice be made in the open sunlight, it is more apt than when made in shadow to fall on the side of honorable behavior.

The lesson to be learned from such books as these is not so facile as that the wages of sin is death, or, in Hollywood's more modern version, that the penalty of sinning is suffering. That is not enough to save a book from proper censorship. The tragedy of these books is not in death but in the texture of the slope that leads to death—in the inner suffering that comes at times from crimes against oneself as much as from crimes against society. That has been the green pastures of storytellers ever since the Greek dramatists, especially when the pressures on a character are not,

as they are not always, of his own making or within his control. Sin is too apt a word to take in the full reach of circumstance, and I venture to say that in human experience suffering does not automatically follow sinning. Our laws have a good deal to do with that guarded notion. It is necessary to know what our laws are up to, and it is my conviction that, outside the police power, the laws of Anglo-Saxon countries are made less as absolute mandates than as clinical experiments. Democratic nations prefer checks and balances to absolute authority, and it is worthy of notice that the jury system exists only in those countries where the law is not considered to have been drawn, as Cicero put it, from the forehead of the gods, but rather from the will of the people, who wish to keep an eye on it. The eighteenth amendment to the Constitution is a case in point.

Such sumptuary laws, and some economic ones, differ from obscenity statutes only in the degree of danger to society inherent in the appetite in question. The need for decency is as old as the appetites, but it is not expressed in uniform law or custom. The ancient Hebrews had a rigid moral code which, for example, excluded bastards from the congregation up to the tenth generation, for the combined reasons of preserving their ancient tradition of tribe and family and of increasing the number of effective warriors. The Greeks, more cosmopolitan in a country whose sterile soil could not support many people comfortably, approved pederasty and a restricted form of concubinage in order to keep the population down. Standards of sexual behavior, as well as of the need to censor it, have shifted from age to age, from country to country, and from economy to economy. The State of New Mexico has no obscenity statute. South Carolina has no divorce law.

Censorship, which is the policeman of decency, whether religious, patriotic, or moral, has had distinct

fashions, depending on which great questions were agitating society at the time. During the Middle Ages, when the church was supreme, the focus of suppression was upon heresy and blasphemy. When the State became uppermost, the focus of suppression was upon treason and sedition. The advent of technology made Queen Victoria realize, perhaps subconsciously, that loose morals would threaten the peace of mind necessary to the development of invention and big business; the focus moved to sexual morality. We are now emerging into an era of social ideology and psychology, and the focus is turning to these. The right to speak out and to act freely is always at a minimum in the area of the fighting faiths.

The censorship of books did not become a broad public issue until after the invention of printing in the fifteenth century. The earliest real example of it was the first Index Librorum Prohibitorum of the Catholic Church in 1559, and the church was broadly tolerant of sexual impurity in the books that it considered; its main object was the suppression of heresy. I think it is a fair general statement that from ancient times until the Comstockian laws of 1873 the only form of written obscenity that was censored was "dirt for dirt's sake".

I do not regard the above as apart from the decisional purpose of this case. The words of the statute—"obscene, lewd, lascivious, filthy, indecent, or disgusting" —restrict rather than broaden the meaning of a highly penal statute. The effect of this plethora of epithets is to merge them into one prevailing meaning—that of sexual impurity alone, and this has been universally held: People v. Eastman, 188 N. Y. 478 (1907) ; People v. Wendling, 258 N. Y. 451 (1932) ; Commonwealth v. Isenstadt, supra (318 Mass. 543 (1945) ) ; Attorney General v. "Forever Amber", (Mass.) 81 N. E. (2d)

663 (1948); United States v. Ulysses, supra, (72 F.(2d) 705 (1934)).

In Swearingen v. United States, 161 U. S. 446 (1896), a case involving the mailing of obscene matter, the court said:

"The offence aimed at, in that portion of the statute we are now considering, was the use of the mails to circulate or deliver matter to corrupt the morals of the people. The words 'obscene', 'lewd', and 'lascivious', as used in the statute, signify that form of immorality which has relation to sexual impurity, and have the same meaning as is given them at common law in prosecutions for obscene libel. As the statute is highly penal, it should not be held to embrace language unless it is fairly within its letter and spirit."

This view has been adopted in Pennsylvania, for the court said in Commonwealth v. New, supra (142 Pa. Superior Ct. 358 (1940)):

"The test for obscenity most frequently laid down seems to be whether the writing would tend to deprave the morals of those into whose hands the publication might fall by suggesting lewd thoughts and exciting sensual desires."

The statute is therefore directed only at sexual impurity and not at blasphemy or coarse and vulgar behavior of any other kind. The word in common use for the purpose of such a statute is "obscenity". The great point of this case is to find out what that word means.

Nowhere in the statute is there a definition of it or a formula given for determining when it exists. Its derivation, *ob* and *scena*, suggests that anything done offstage, furtively, or lefthandedly, is obscene. The act does not penalize anyone who seeks to change the prevailing moral or sexual code, nor does it state that the writing must be such as to corrupt the morals of the public or of youth; it merely proscribes books that *are* obscene and leaves it to the authorities to de-

cide whether or not they are. This cannot be done without regard to the nature and history of obscenity. It is unlike the fundamental laws of property, of crimes like murder, rape, and theft, or even of negligence, whose meaning has remained relatively constant. That of obscenity has frequently changed, almost from decade to decade within the past century; "Ulysses" was condemned by the State courts in New York just 10 years before it was cleared by Judge Woolsey in the District Court for the Southern District of New York. I must determine what this elusive word means now.

Something might be said at the outset about the familiar four-letter words that are so often associated with sexual impurity. These are, almost without exception, of honest Anglo-Saxon ancestry, and were not invented for purely scatological effect. The one, for example, that is used to denote the sexual act is an old agricultural word meaning "to plant", and was at one time a wholly respectable member of the English vocabulary. The distinction between a word of decent etymological history and one of smut alone is important; it shows that fashions in language change as expectably as do the concepts of what language connotes. It is the old business of semantics again, the difference between word and concept.

But there is another distinction. The decisions that I shall cite have sliced off vulgarity from obscenity. This has had the effect of making a clear division between the words of the bathroom and those of the bedroom: the former can no longer be regarded as obscene, since they have no erotic allurement, and the latter may be so regarded, depending on the circumstances of their use. This reduces the number of potentially offensive words sharply.

With such changes as these, the question is whether the legal mace should fall upon words or upon concepts —language or ideas.

Obscenity is not like sedition, blasphemy, or open lewdness, against which there are also criminal statutes. These offenses not only have acquired precise meaning but are defined specifically in the act. Sedition (Act of June 24, 1939, P. L. 872, section 207, 18 PS §4207), which includes writing and publication, is carefully defined in eight subheadings. Blasphemy (same act, section 523, 18 PS §4523) is stated as speaking "loosely and profanely of Almighty God, Christ Jesus, the Holy Spirit, or the Scriptures of Truth". Open lewdness (same act, section 519, 18 PS §4519) is "any notorious act of public indecency, tending to debauch the morals or manners of the people". Other crimes, involving restriction on free speech and having their scope or purpose set forth with particularity in The Penal Code, include blackmail (section 801), libel (section 412), anonymous communications (section 414), false letters of recommendation (section 856), false advertising (section 857), advertising without publisher's consent (section 858), and fortune telling (section 870).

No such definition of standard or legislative intention occurs in section 524, and I am convinced that without a declaration of the legislature's intention as to what obscenity means or of what the lawmakers sought to prevent, there is no constant or reliable indication of it to be found in human experience.

The argument is often made that anyone can tell by instinct what is obscene and what is not, even if it is hard to put the difference into words. The same might be said of sedition, blasphemy, and open lewdness, but the legislature was careful to specify. With regard to obscenity, however, the argument does not hold water. When he was an editor, Walter Hines Page deleted the word "chaste" because it was suggestive, and the play "Sappho" was banned in New York City because a man carried the leading lady up a flight

of stairs. A librarian once charged Mark Twain's "Tom Sawyer" and "Huckleberry Finn" with corrupting the morals of children. In 1907 Richard Strauss's "Salome" was banned in Boston. Charlotte Bronte's "Jane Eyre", when first published, was called "too immoral to be ranked as decent literature". Hawthorne's "Scarlet Letter" was referred to as "a brokerage of lust". George Eliot's "Adam Bede" was called "the vile outpourings of a lewd woman's mind". Others to suffer similarly were Elizabeth Barrett Browning's "Aurora Leigh", Hardy's "Tess" and "Jude", DuMaurier's "Trilby", and Shaw's "Mrs. Warren's Profession". Walt Whitman lost his job in the United States Department of the Interior because of "Leaves of Grass".

It is presumed that Mr. Page and the others who attacked this imposing array of classics could tell by instinct what was decent and what was not. The idea that instinct can be resorted to as a process of moral stare decisis reduces to absurdity.

It is a far cry from the examples just cited to what society accepts as innocuous now. The stage, literature, painting, sculpture, photography, fashions of dress, and even the still pudibund screen tolerate things that would have made Anthony Comstock turn blue. In its issue of April 11, 1938, Life magazine ran a series of factual and dignified pictures called "The Birth of a Baby". It was attacked in the courts but was exonerated. Dr. Kinsey's report on the sexual behavior of men is now current. Truth and error, as Milton urged in his "Areopagitica", are being allowed to grapple, and we are the better for it.

In addition to the books whose banning is the subject of cases cited later in this opinion, I suggest a short list of modern books that have not been banned, so far as I can find out. All of these books contain sexual material, and all of them can be found in the Boston Public Library. I defy anyone to provide a rational

basis for the distinction between these two sets of books. My list includes: Fanny Hurst's "Back Street"; Arthur Koestler's "Arrival and Departure"; Erich Maria Remarque's "All Quiet on The Western Front" and "Arch of Triumph"; Eugene O'Neill's "Anna Christie" and "Hairy Ape"; John Dos Passos's "U. S. A."; Ernest Hemingway's "For Whom the Bell Tolls"; Somerset Maugham's "Of Human Bondage"; Charles Morgan's "The Fountain" and "The Voyage"; Richard Wright's "Black Boy".

It is no answer to say that if my point about the books just listed be sound, then by analogy the law against murder is useless because all murderers are not caught. The inherent evil of murder is apparent, but by what apparent, inherent standard of evil is obscenity to be judged, from book to book? It is my purpose to provide such a standard, but it will reduce to a minimum the operation of any norm of indefinite interpretation.

Before leaving this point, research discloses a curious but complete confusion between the post office and the customs over what constitutes obscenity. No unanimity of opinion unites these two governmental services in a common standard. Books have cleared the port only to find the mails closed to them: others, printed here, have circulated freely while foreign copies were stopped at the ports. One would expect greater uniformity than this if obscenity could be unmistakably detected.

There is a bale of literature on obscenity and the history of censorship, i. e., suppression of the right of free expression. It is best represented by two books by Morris L. Ernst, Esq., entitled "To The Pure" (Viking Press, 1929) and "The Censor Marches On" (Doubleday, Doran & Co., 1940), with William Seagle and Alexander Lindey, respectively, colloborating. In addition to the brilliant and scholarly text, there is a

large bibliography and appendices. These two books should be required reading, of at least equal importance with legal authority, in deciding a censorship case.

An interesting volume on literary censorship is "Banned Books", by Anne Lyon Haight (R. R. Bowker Co., New York, 1935), which lists the principal suppressions of books, for various reasons, at various times and in various places, from Caligula's attempt to suppress "The Odessey" in A. D. 35 to the lifting of the ban on "Ulysses" in 1934.

The legal authorities on obscenity may be found well collected in 76 A. L. R. 1099, and 81 A. L. R. 801.

It is my conclusion that the books before me are obvious efforts to show life as it is. I cannot be convinced that the deep drives and appetites of life are very much different from what they have always been, or that censorship has ever had any effect on them, except as the law's police power to preserve the peace in censorship. I believe that the consensus of preference today is for disclosure and not stealth, for frankness and not hypocrisy, and for public and not secret distribution. That in itself is a moral code.

It is my opinion that frank disclosure cannot legally be censored, even as an exercise of the police power, unless it is sexually impure and pornographic, as I shall define those words. They furnish the only possible test for obscenity and its effect.

These books are not, in my view, sexually impure and pornographic.

### The Pennsylvania Cases

I venture a long and detailed opinion because this is the first case in Pennsylvania that deals with current literature in book form. Our authorities on the censoring of obscenity are so few that they can all be referred to.

The earliest case is that of Commonwealth v. Sharpless, 2 S. & R. 91 (1815), in which defendant was convicted of exhibiting an indecent picture. The case has importance because of the holding by Tilghman, C. J., that since there was no act of assembly on the matter, the case had to be decided on common-law principles, which he found covered such an indictment. The chief justice did not doubt that the publication of an indecent book was also indictable at common law, and cited the English case of Rex v. Curl, 2 Str. 788, 93 E. R. 849 (1727).

The Sharpless case can be taken as authority that obscenity was a common-law offense in England at the time of the American Revolution and hence became part of the common law of Pennsylvania. The status of the common law on many points often depends on the date to which one opens the books, and it should be observed that obscenity was not a part of English common law until Rex v. Curl, supra: in Regina v. Read, Fortescue, 98, 92 E. R. 777 (1707), only 20 years earlier, the lords wished that there were a law to punish the publication of "The Fifteen Plagues of a Maidenhead", but decided that they couldn't make one—it was a matter for the ecclesiastical courts.

In Rex v. Wilkes, 4 Burr. 2527, 98 E. R. 327 (1770), defendant was indicted and convicted of printing an obscene libel entitled "An Essay on Women". Jurisdiction was assumed, for there was no discussion of it nor was any objection made to the indictment: the reported proceedings have to do with procedural matters and with the propriety of a sentence of outlawry for a misdemeanor.

It is on these two cases—Rex v. Curl and Rex v. Wilkes—and on Blackstone that indictable obscenity as a part of the English common law depends.

Blackstone, who began his Vinerian lectures on October 25, 1758, after labors "of so many years" in

collecting his material, says, in Book IV of the Commentaries, pp. 150 and 151, that libels in their largest and most extensive sense signify any writings, pictures, or the like, of an immoral or illegal tendency, and are punishable in the interest of the preservation of peace and good order. It is interesting to note that he goes on at once to make the point that freedom of the press is not involved, since the right exists to publish anything, but only the abuse of it, established by trial after publication, is punishable.

While Blackstone had only Rex v. Curl (1727) to support him as authority, he is regarded as authority himself, and it must therefore be held that obscene publication was indictable at common law.

It is important to observe that there are few, if any, obscene book cases in the English reports between the time of Rex v. Curl, in 1727, and Regina v. Hicklin, in 1868; that in Pennsylvania no act was passed against obscenity until 1860, and that no case involving an obscene book appeared until Commonwealth v. Landis, infra, in 1870. Commonwealth v. Sharpless, in 1815, mentioned books by dictum only.

This removes from the doctrine of indictable obscenity much of the veneration that is usually given to common-law doctrines because of their hoary age. The plain fact is that the period of the Renaissance, in both countries, was a lusty one, and that concern over sexual purity did not begin to arise until Victorianism really took hold in the middle 1850's. One need only recall that the father of the post office, Benjamin Franklin, wrote and presumably mailed his "Letter of Advice to Young Men on the Proper Choosing of a Mistress"; that Thomas Jefferson worried about the students at his new University of Virginia having a respectable brothel; that Alexander Hamilton's adultery while holding public office created no great scandal, or that the morals of Southern chivalry provided us

with mulattos until the abolition of slavery at least made the matter one of free choice on both sides.

The formulation of the common-law proscription of obscene publication did not, therefore, amount to very much. It is a good example of a social restriction that became law and was allowed to slumber until a change of social consciousness should animate it. It is the prevailing social consciousness that matters quite as much as the law. Between 1870 and 1930 the obscenity law was on the social anvil: since then society has found other irons in the fire and has lost its interest in what Shaw has called Comstockery.

The next Pennsylvania case was Commonwealth v. Landis, 8 Phila. 453 (1870), in which defendant was convicted of selling a book called "Secrets of Generation". This case is interesting because it holds that it was for the jury to say whether the book was obscene, and that "that which offends modesty, and is indecent and lewd, and tends to the creation of lascivious desires, is obscene". Not only is this the first book case in the State, but it is the first example of showing the effort by both legislature and courts to define the libidinous synonyms in terms of each other: obscenity is filthiness, filthiness is indecency, indecency is lewdness, lewdness is lasciviousness, and lasciviousness is obscenity. The opinion also states "that to justify a publication of the character of this book they (the jury) must be satisfied that the publication was made for a legitimate and useful purpose, and that it was not made from any motive of mere gain or with a corrupt desire to debauch society". It ends with a warning that a book, obscene in itself, might be used either for a proper purpose, such as medical instruction, or for an improper one, such as general publication, and that in the latter case the utterer would have to answer.

In Commonwealth v. Havens, 6 Pa. C. C. 545 (1889), the constitutionality of the Act of May 6, 1887, was upheld, on the one ground advanced, that its title was broad enough. The case involved "The National Police Gazette" and "The Illustrated Police News". A conviction resulted. The court restricted the evidence to the specific advertisements complained of and refused to allow testimony as to what their real purpose was. Their inherent indecency was the only issue. The test of obscenity finally approved by the opinion was: "Would the articles or the pictures here . . . suggest impure and libidinous thoughts in the young and inexperienced?"

In re Arentsen, 26 W. N. C. 359 (1890), dealt with Count Leo Tolstoy's "Kreutzer Sonata". This case also holds that selling an obscene book was a common-law offense, and Judge Thayer cited Regina v. Hicklin, L. R. 3 Q. B. 360 (1868), of which more hereafter. Defendant was acquitted because the book was found to condemn marriage, not in favor of free love but of complete celibacy.

In Commonwealth v. Dowling, 14 Pa. C. C. 607 (1894), defendant was convicted of selling immoral newspapers to minors. The case is of little interest, except for the affirmance of one of defendant's points for charge: "The law does not undertake to punish bad English, vulgarity, or bad taste, and no matter how objectionable the jury may consider the papers referred to on those grounds, they have no right to convict on account of them."

In Commonwealth v. Magid & Dickstein, 91 Pa. Superior Ct. 513 (1927), the subject matter was indecent pictures. The court stated that the purpose of the Acts of 1887 and 1897 was "to shield minors and young children from obscene and indecent books and pictures."

In Commonwealth v. Kutler, 93 Pa. Superior Ct. 119 (1928), and Commonwealth v. Kufel, 142 Pa. Superior Ct. 273 (1940), the only question was whether defendants were the ones who sold certain pamphlets, the obscene character of which was conceded.

In Commonwealth v. New, supra (142 Pa. Superior Ct. 358 (1940)), the matter involved was certain pictures in a magazine called "Tipster". The test of obscenity adopted by the court shows a virtual abandonment of the harsh rule of Regina v. Hicklin, infra, and is stated thus: "Whether the writing would tend to deprave the morals of those into whose hands the publication might fall by suggesting lewd thoughts and exciting sensual desires." The purpose of the act is again stated to be the prevention of "appealing to those of depraved tastes or to the curiosity of adolescents".

In Commonwealth v. Mercur, 90 Pitts. L. J. 318 (1942), the court applied the "as a whole" rule of Commonwealth v. New, supra, and held that certain pictures appearing in a book of instruction for photographers called "U. S. Camera 1942", did not render the volume obscene.

This exhausts the Pennsylvania cases.

It is therefore clear that section 524 of our act has not yet been applied to serious current literature. There has not been the opportunity to form a modern test for obscenity in Pennsylvania as there has been in the lower Federal courts, and in the highest appellate courts of New York and Massachusetts.

Despite the scarcity of literary obscenity cases in this State, the trend has been away from and beyond the English common law. The range in growth of doctrine is from the dictum in the Sharpless case, that the common-law rule of obscene libel would apply to a book, to the opinion in the New case, that a book must be considered as a whole and regard be given to its

place in the arts. The English appellate courts have not gone so far, as will be seen.

The first articulate test appears in the leading English case of Regina v. Hicklin, L. R. 3 Q. B. 360 (1868), and the American jurisdictions have had to face .it before they could disregard it and forge the modern rule. In Pennsylvania, the rule for which it has become famous was. cited with approval in Commonwealth v. Havens, supra (6 Pa. C. C. 545 (1889)), and again in In re Arentsen, supra (26 .W. N. C. 359 (1890)), but. the modern American rule has. not yet been squarely adopted here.

### The English Cases

Regina v. Hicklin is an example of judge-made law quite at variance with the parliamentary intent behind the act on which it was based. Lord Campbell's act provided for search and seizure warrants that would enable the police to take and destroy obscene publications. The report of the debates in Hansard show the lords' difficulties in deciding what an obscene publication might be. Lord Campbell, who was lord chief justice at the time, explained that the act was to apply exclusively to works written for the purpose of corrupting the morals of youth and of a nature calculated to shock the common feelings of decency in any well regulated mind. He was ready to make whatever was then indictable a test of obscenity in his new act. He made it clear that any work that even pretended to be literature or art, classic or modern, had little to fear.

All of this was nullified by Lord Chief Justice Cockburn in the Hicklin case, where the subject matter was a pamphlet entitled "The Confessional Unmasked", and containing a diatribe against the Catholic Church; its purpose was to show the depravity of the priesthood and the character of the questions put to women

in the confessional. This is the now famous rule of the case:

"I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."

Strictly applied, this rule renders any book unsafe, since a moron could pervert to some sexual fantasy to which his mind is open the listings in a seed catalogue. Not even the Bible would be exempt; Annie Besant once compiled a list of 150 passages in Scripture that might fairly be considered obscene—it is enough to cite the story of Lot and his daughters, Genesis 19, 30-38. Portions of Shakespeare would also be offensive, and of Chaucer, to say nothing of Aristophanes, Juvenal, Ovid, Swift, Defoe, Fielding, Smollett, Rousseau, Maupassant, Voltaire, Balzac, Baudelaire, Rabelais, Swinburne, Shelley, Byron, Boccaccio, Marguerite de Navarre, Hardy, Shaw, Whitman, and a host more.

As will be seen later, the classics—whatever that may mean precisely—are considered exempt from censorship, but many of them were hounded in England, despite Lord Campbell's assurances, as a result of the rule of the Hicklin case.

The next English case—passing Regina v. Read, Rex v. Curl, and Rex v. Wilkes, which have been examined above—was Steele v. Brannan, L. R. 7 C. P. 261 (1872), which involved the report of the trial of one George Mackey for selling a pamphlet called "The Confessional Unmasked". The report set forth the pamphlet in full, and the court held not only the publication was not privileged as a report of legal proceedings but that it was obscene, despite its purpose to expose what the author considered dangerous religious practices. The court followed Regina v. Hicklin, without quoting the rule, and placed its point of emphasis

upon the effect of the pamphlet "on the young and in-experienced".

The next case was Bradlaugh v. Regina, L. R. 3 Q. B. 607 (1878), in which a conviction for publishing a book called "Fruits of Philosophy" was reversed. The point was whether the allegedly obscene matter should be included in the indictment instead of being referred to by name only. The Court of Error held that it should be, and expressly avoided passing upon the character of the book.

The lower court case of Regina v. Thomson, 64 J. P. 456 (1900), in which the jury found defendant not guilty in an issue of whether or not the "Heptamer-on", by Queen Margaret of Navarre, was obscene, is interesting because of the charge of Bosanquet, C. S. It is the first mention that I have found in the English reports of the idea that fashions in obscenity change. After mentioning that in the Middle Ages things were discussed which would not be tolerated now, if given general publicity, Sergeant Bosanquet left it to the jury to say "whether the book is a fit book to put into people's hands in these days at the end of the nine-teenth century". The jury felt that it was.

Sergeant Bosanquet was referred to with respect in Rex v. Barraclough, L. R. 1 K. B. 201 (1906), but the opinions, while mentioning Regina v. Hicklin in-directly, decided a point under a new act of Parliament as to what the indictment should contain. A conviction for publishing an obscene typewritten document that libeled one Edith Woodhead was upheld.

In Rex v. Montalk, 23 Cr. App. Rep. 182 (1932), a conviction for publishing a typewritten libel was sus-tained, the lord chief justice citing Regina v. Hicklin in a very brief opinion. In the court below, the recorder charged the jury that if it was of the opinion "that this can be for the public good as an advancement of literature, in my opinion that would be a defense".

The libel was not a book but a series of verses on half a dozen sheets of paper.

This exhausts the reported English cases that are in point. They show continued adherence to the Hicklin rule, but the paucity of authority is noteworthy. It is as if the English public does not want to risk the severity of the common law, and it is clear proof to me of the clinical nature of the laws that are made to cover social situations. While the higher English courts were kept relatively idle on the question, private censorship in England has been very active; the most effective censor of the Victorian era was Mudie's circulating library. It was the time of the three-decker novel—ponderous, dull, and pure as the driven snow. When Mudie's power was finally broken, smaller circulating libraries continued to wield the same sort of influence and to reflect the general desire of the public for no disturbing material of an emotional nature. England was the pioneer in the advance of the Industrial Age, and the nation of shopkeepers was unwilling to be diverted from making money by sidetrips into erotica; what individuals did in the dark was their affair, but bad morals could not profitably become a matter of public concern.     . . . .

The rule of Regina v. Hicklin suited the English, and presumably still does—not as a satisfying standard but as an effective policeman to take over and tone down the situation when the social experiment threatens to get out of hand.

Censorship should be the proper activity of the community rather than of the law, and the community has never been lazy upholding what it believes to be inherently decent at the moment. With a legal policeman handy, the market place is the best crucible in which to distil an instinctive morality. We have the evidence of Milton that there is no authoritative example of the suppression of a book in ancient times solely be-

cause of obscenity, but this does not mean that private criticism was not alert. Plato thought that Homer should be expurgated before Greek children should be allowed to read him. In Plutarch's opinion the comedies of Aristophanes were coarse and vulgar.

This is healthy, for it is the struggle of free opinion: it is not suppression by law. In the English community the people argue and Hicklin stands guard in case of trouble. The American method is different: the rule has been modernized.

## The American Cases

1. The Federal Courts. There are two important opinions involving James Joyce's "Ulysses". Judge Woolsey's, in the district court, is reported as United States v. One Book Entitled Ulysses, 5 F. Supp. 182 (S. D. N. Y., 1933), and Judge Hand's, affirming Judge Woolsey, is reported in 72 F.(2d) 705 (C. C. A. 2d, 1934).

Judge Woolsey's decision may well be considered the keystone of the modern American rule, as it brings out clearly that indictable obscenity must be "dirt for dirt's sake". He said:

"It is because Joyce has been loyal to his technique and has not funked its necessary implications, but has honestly attempted to tell fully what his characters think about, that he has been the subject of so many attacks and that his purpose has been so often misunderstood and misrepresented. For his attempt sincerely and honestly to realize his objective has required him incidentally to use certain words which are generally considered dirty words and has led at times to what many think is a too poignant pre-occupation with sex in the thoughts of his characters.

"The words which are criticized as dirty are old, Saxon words known to almost all men and, I venture, to many women, and are such words as would be

naturally and habitually used, I believe, by the types of folk whose life, physical and mental, Joyce is seeking to describe. . . . As I have stated, 'Ulysses' is not an easy book to read. It is brilliant and dull, intelligible and obscure, by turns. In many places it seems to me to be disgusting, but although it contains, as I have mentioned above, many words usually considered dirty, I have not found anything that I consider to be dirt for dirt's sake. Each word of the book contributes like a bit of mosaic to the detail of the picture which Joyce is seeking to construct for his readers.

"If one does not wish to associate with such folk as Joyce describes, that is one's own choice. In order to avoid indirect contact with them one may not wish to read 'Ulysses'; that is quite understandable. But when such a great artist in words, as Joyce undoubtedly is, seeks to draw a true picture of the lower middle class in a European city, ought it to be impossible for the American public legally to see that picture?"

In affirming Judge Woolsey, Judge Hand said, in the circuit court of appeals:

"That numerous long passages in Ulysses contain matter that is obscene under any fair definition of the word cannot be gainsaid; yet they are relevant to the purpose of depicting the thoughts of the characters and are introduced to give meaning to the whole, rather than to promote lust or portray filth for its own sake. The net effect even of portions most open to attack, such as the closing monologue of the wife of Leopold Bloom, is pitiful and tragic, rather than lustful. The book depicts the souls of men and women that are by turns bewildered and keenly apprehensive, sordid and aspiring, ugly and beautiful, hateful and loving. In the end one feels, more than anything else, pity and sorrow for the confusion, misery, and degradation of humanity. . . . The book as a whole is not pornographic, and, while in not a few spots it is coarse, blasphemous,

and obscene, it does not, in our opinion, tend to promote lust. The erotic passages are submerged in the book as a whole and have little resultant effect."

In the circuit court Judge Manton dissented, and his opinion reviews the earlier Federal cases which he asserts approve the rule of Regina v. Hicklin: the prinicpal ones are U. S. v. Bennett, Fed. Cas. no. 14,571 (1879) ; Rosen v. U. S., 161 U. S. 29, 16 S. Ct. 434, 40 L. Ed. 606 (1896) : Dunlop v. U. S., 165 U. S. 486, 17 S. Ct. 375, 41 L. Ed. 799 (1897).

These cases were individually and carefully distinguished by Judge Hand in the majority opinion, who held them not to represent the law:

"But it is argued that United States v. Bennett, Fed. Cas. No. 14,571, stands in the way of what has been said, and it certainly does. There a court, consisting of Blatchford, C. J., and Benedict and Choate, D.J.J., held that the offending paragraphs in a book could be taken from their context and the book judged by them alone, and that the test of obscenity was whether the tendency of these passages in themselves was 'to deprave the minds of those open to such influences and into whose hands a publication of this character might come.' The opinion was founded upon a dictum of Cockburn, C. J., in Regina v. Hicklin, L. R. 3 Q. B. 360, where half of a book written to attack the alleged practices of the confession was obscene and contained, as Mellor, J., said 'a great deal . . . which there cannot be any necessity for in any legitimate argument on the confessional. . . .' It is said that in Rosen v. United States, 161 U. S. 29, 16 S. Ct. 434, 480, 40 L. Ed. 606, the Supreme Court cited and sanctioned Regina v. Hicklin, and United States v. Bennett. The subject matter of Rosen v. United States was, however, a pictorial representation of 'females, in different attitudes of indecency'. The figures were partially covered 'with lamp black that could be easily erased with a piece of

bread.' p. 31 of 161 U. S., 16 S. Ct. 434. The pictures were evidently obscene, and plainly came within the statute prohibiting their transportation. The citation of Regina v. Hicklin and United States v. Bennett, was in support of a ruling that allegations in the indictment as to an obscene publication need only be made with sufficient particularity to inform the accused of the nature of the charge against him. No approval of other features of the two decisions was expressed, nor were such features referred to. Dunlop v. United States, 165 U. S. 486, 489, 17 S. Ct. 375, 41 L. Ed. 799, also seems to be relied on by the government, but the publication there was admittedly obscene and the decision in no way sanctioned the rulings in United States v. Bennett, which we first mentioned. The rigorous doctrines laid down in that case are inconsistent with our own decision in United States v. Dennett, (C. C. A.) 39 F. (2d) 564, 76 A. L. R. 1092, as well as with Konda v. United States, (C. C. A.) 166 F. 91, 92, 22 L. R. A. (N. S.) 304; Clark v. United States, (C. C. A.) 211 F. 916, 922; Halsey v. New York Society for the Suppression of Vice, 234 N. Y. 1, 4, 136 N. E. 219; and St. Hubert Guild v. Quinn, 64 Misc. 336, 339, 118 N. Y. S. 582, and, in our opinion, do not represent the law. They would exclude much of the great works of literature and involve an impracticability that cannot be imputed to Congress and would in the case of many books containing obscene passages inevitably require the court that uttered them to restrict their applicability."

It is quite clear that the harsh rule of Regina v. Hicklin has been supplanted by the modern test of obscenity, namely, whether the matter in question has a substantial tendency to deprave or corrupt by inciting lascivious thoughts or arousing lustful desire in the ordinary reader. This has been stated in various ways.

It has been said that the matter charged, to be obscene, must "suggest impure or libidinous thoughts", must "invite to lewd and lascivious practices and conduct", must "be offensive to chastity", must "incite dissolute acts", must "create a desire for gratification of animal passions", must "encourage unlawful indulgences of lust", must "attempt to satisfy the morbid appetite of the salacious", must "pander to the prurient taste". See, United States v. Journal Co., Inc., 197 Fed. 415 (D. C., Va., 1912), United States v. Klauder, 240 Fed. 501 (D. C., N. Y., 1917), United States v. Durant, 46 Fed. 753 (D. C., S. C., 1891), United States v. Moore, 104 Fed. 78 (D. C., Ky., 1900), United States v. Reinheimer, 233 Fed. 545 (D. C., Pa. 1916), United States v. Clarke, 38 Fed. 732 (D. C., Mo., 1889), Dysart v. United States, 4 F. (2d) 765, reversed, 272 U. S. 655 (1926), United States v. Wroblenski, 118 Fed. 495 (D. C., Wis., 1902), United States v. O'Donnell, 165 Fed. 218 (D. C., N. Y., 1908), United States v. Smith, 11 Fed. 663, (D. C., Ky., 1882), United States v. Wightman, 29 Fed. 636 (D. C., Pa., 1886), United States v. Wyatt, 122 Fed. 316 (D. C., Del., 1903), Hanson v. United States, 157 Fed. 749 (C. C. A. 7th, 1907), United States v. Davidson, 244 Fed. 523 (D. C., N. Y., 1917), Dunlop v. United States, 165 U. S. 486 (1897), United States v. Males, 51 Fed. 41 (D. C., Ind., 1892), and MacFadden v. United States, 165 Fed. 51 (C. C. A. 3d, 1908).

In Walker v. Popenoe, 149 F. (2d) 511 (1945), it was held:

"The effect of a publication on the ordinary reader is what counts. The Statute does not intend that we shall 'reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few' ".

This test, however, should not be left to stand alone, for there is another element of equal importance—the tenor of the times and the change in social acceptance

of what is inherently decent. This element is clearly set forth in United States v. Kennerley, 209 Fed. 119 (D. C., N. Y., 1913), where Judge Hand said:

"If there be no abstract definition, such as I have suggested, should not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the community may have arrived here and now? . . . Nor is it an objection, I think, that such an interpretation gives to the words of the statute a varying meaning from time to time. Such words as these do not embalm the precise morals of an age or place; while they presuppose that some things will always be shocking to the public taste, the vague subject matter is left to the gradual development of general notions about what is decent."

In his The Paradoxes of Legal Science, Mr. Justice Cardozo said: "Law accepts as the pattern of its justice the morality of the community whose conduct it assumes to regulate" (p. 37). In Towne v. Eisner, 245 U. S., 418, 425, 62 L. Ed. 372, 376 (1918) Mr. Justice Holmes said: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." And in the same vein, Professor Wormser wrote in The Development of the Law, 23 Columbia Law Review, 701, 702 (1923): "Increasingly—ever increasingly—the community is beginning to require of the law that it justify its own administration of its resources before the bar of public opinion. And in order to justify itself before this critical bar, the law must be brought to evidence the mores of the times, to which it must conform, or it will fail to fulfill its function as the judicial expression of the community passion for justice and right dealing."

2. The New York Courts. The modern test was applied in People v. Wendling, 258 N. Y. 451, (1932),

which involved the dramatization of the song "Frankie and Johnnie". In holding that the courts are not censors of morals and manners, Judge Pound said:

"The language of the play is coarse, vulgar and profane; the plot cheap and tawdry. As a dramatic composition it serves to degrade the stage where vice is thought by some to lose 'half its evil by losing all its grossness.' 'That it is "indecent" from every consideration of propriety is entirely clear' (People v. Eastman, 188 N. Y. 478, 480), but the court is not a censor of plays and does not attempt to regulate manners. One may call a spade a spade without offending decency, although modesty may be shocked thereby. (People v. Muller, 96 N. Y. 408, 411). The question is not whether the scene is laid in a low dive where refined people are not found or whether the language is that of the bar room rather than the parlor. The question is whether the tendency of the play is to excite lustful and lecherous desire. (People v. Eastman, supra; People v. Muller, supra)."

Since the New York cases are generally in line with the modern Federal rule above stated, it is necessary only to cite the principal one: Halsey v. N. Y. Society for the Suppression of Vice, 234 N. Y. 1 (1922), which involved Theophile Gautier's "Mademoiselle de Maupin"; People v. Brainard, 192 App. Div. (N. Y.) 816 (1920), where the subject was "Madeleine", the anonymous autobiography of a prostitute.

3. The Massachusetts Courts. Boston has long been the center of book suppression in this country. Before 1930 the Massachusetts obscenity statute forbade the sale of any book "*containing* obscene, indecent language". The Supreme Court upheld convictions for the sale of Dreiser's "An American Tragedy" and D. H. Lawrence's "Lady Chatterly's Lover". After a general wave of censorship that swept over Boston in 1929 and resulted in the suppression of 68 books, the law was

changed to proscribe the sale of "a book which *is* obscene, indecent," etc.

The result was the modern rule, but the Massachusetts courts were still severe with individual books. Commonwealth v. Isenstadt, 318 Mass. 543 (1945), upheld a conviction for the sale of "Strange Fruit", and while it announced the modern rule to great extent, it refused to sanction the idea that sincerity of purpose and artistic merit would necessarily dispel obscenity. But it clearly held that the time and custom of the community are important elements. The court said:

"Since effect is the test, it follows that a book is to be judged in the light of the customs and habits of thought of the time and place of the alleged offense. Although the fundamentals of human nature change but slowly, if indeed they change at all, customs and habits of thought do vary with time and place. That which may give rise to impure thought and action in a highly conventional society may pass almost unnoticed in a society habituated to greater freedom."

In the very recent case of Attorney General v. Book Named "Forever Amber", decided October 11, 1948, and reported in 81 N. E. (2d) 663, the court repeated the stand it took in Commonwealth v. Isenstadt, supra, but it goes further on the question of sincerity and artistic purpose when the court said:

"It (the book) undoubtedly has historical purpose, and in this is adequately accurate in achievement. . . . The paramount impression is of an unfortunate country and its people as yet unfreed of the grasp of the Stuarts. . . . As to the individual characters, the reader is left with an estimate of an unattractive, hedonistic group, whose course of conduct is abhorrent and whose mode of living can be neither emulated nor envied."

## The Modern Test of Obscenity

From all of these cases the modern rule is that obscenity is measured by the erotic allurement upon the average modern reader; that the erotic allurement of a book is measured by whether it is sexually impure— i. e., pornographic, "dirt for dirt's sake", a calculated incitement to sexual desire—or whether it reveals an effort to reflect life, including its dirt, with reasonable accuracy and balance; and that mere coarseness or vulgarity is not obscenity.

Forging such a rule from the precedents does not fully reach the heart of the matter, for I am sure that the books before me could be declared obscene or not obscene under either the Hicklin or the modern rule. Current standards create both the book and the judgment of it.

The evil of an indefinite statute like our section 524, however, is that it is also too loose. Current standards of what is obscene can swing to extremes if the entire question is left open, and even in the domestic laboratories of the States such freedom cannot safely be allowed. It is no longer possible that free speech be guaranteed Federally and denied locally; under modern methods of instantaneous communication such a discrepancy makes no sense. If speech is to be free anywhere, it must be free everywhere, and a law that can be used as a spigot that allows speech to flow freely or to be checked altogether is a general threat to free opinion and enlightened solution. What is said in Pennsylvania may clarify an issue in California, and what is suppressed in California may leave us the worse in Pennsylvania. Unless a restriction on free speech be of National validity, it can no longer have any local validity whatever. Some danger to us all must appear before any of us can be muzzled.

In the field of written obscenity this principle has met oblique acceptance with regard to what is called

"the classics", which are now exempt from legal censorship. Just how old a work must be before it can enjoy this immunity is uncertain, but what we know as classics are the books by remarkable people that have withstood the test of time and are accepted as having lasting value; they have become historical samples, which itself is important. This importance could not be as great if the screening process were not free.

Current literature, good, bad, or indifferent, goes into the hopper without any background for judgment; it is in the idiom of the moment and is keyed to the tempo of modern life. I do not believe that such considerations should result in removing any of the output from the hopper before the process of screening can begin. What is pure dirt to some may be another's sincere effort to make clear a point, and there is not much difference, from the historical angle, between censoring books before publication and suppressing them afterwards, before there has been a reasonable chance to judge them. Blackstone's neat distinction may satisfy an exact legal mind, but it has no meaning for history. The unworthy books will die soon enough, but the great work of genius has a hard enough time to make its way even in the free market of thought. James Joyce, whose work is difficult to understand, even after years of study, has evolved a new form of communication, by his method of using words, that will some day be a shorthand for complexity. The public was deprived for years of this work of genius because someone found objectionable passages in it.

I can find no universally valid restriction on free expression to be drawn from the behavior of "l'homme moyen sensuel", who is the average modern reader. It is impossible to say just what his reactions to a book actually are. Moyen means, generally, average, and average means a median between extremes. If he reads an obscene book when his sensuality is low, he

will yawn over it or find that its suggestibility leads him off on quite different paths. If he reads the Mechanics' Lien Act while his sensuality is high, things will stand between him and the page that have no business there. How can anyone say that he will infallibly be affected one way or another by one book or another? When, where, how, and why are questions that cannot be answered clearly in this field. The professional answer that is suggested is the one general compromise—that the appetite of sex is old, universal, and unpredictable, and that the best we can do to keep it within reasonable bounds is to be our brother's keeper and censor, because we never know when his sensuality may be high. This does not satisfy me, for in a field where even reasonable precision is utterly impossible, I trust people more than I do the law. Had legal censorship been as constant throughout the centuries as the law of murder, rape, theft, and negligence, a case for the compromise could be made out; as it is, legal censorship is not old, it is not popular, and it has failed to strengthen the private censor in each individual that has kept the race as decent as it has been for several thousand years. I regard legal censorship as an experiment of more than dubious value.

I am well aware that the law is not ready to discard censorship altogether. The English keep their policeman handy, just in case, and the modern rule is a more efficient policeman. Its scope, however, must be defined with regard to the universal right of free speech, as limited only by some universally valid restriction required by a clear and present danger. For this we must consider the Constitution and the cases lately decided under it.

### Constitutional Questions

The fourteenth amendment to the Federal Constitution prohibits any State from encroaching upon

freedom of speech and freedom of the press to the same extent that the first amendment prevents the Federal Congress from doing so: Pennekamp v. Florida, 328 U. S. 331 (1946); Chaplinsky v. New Hampshire, 315 U. S. 568 (1942); Thornhill v. Alabama, 310 U. S. 88 (1940); Winters v. New York, 333 U. S. 507, 68 S. Ct. 665 (1948).

The principle of a free press covers distribution as well as publication: Lovell v. City of Griffin, 303 U. S. 444, 58 S. Ct. 666 (1938).

These guarantees occupy a preferred position under our law to such an extent that the courts, when considering whether legislation infringes upon them, neutralize the presumption usually indulged in favor of constitutionality: Thomas v. Collins, 323 U. S. 516, 530 (1945); Thornhill v. Alabama, 310 U. S. 88 (1940); United States v. Carolene Products Co., 304 U. S. 144, 152, note 4 (1938). See also Spayd v. Ringing Rock Lodge, 270 Pa. 67 (1921).

And article 1, sec. 7 of the Pennsylvania Constitution states that:

"The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

When the first amendment came before the Supreme Court for interpretation in Reynolds v. United States, 98 U. S. 145 (1878), the court declared that government had no authority whatsoever in the field of thought or opinion: only in the area of conduct or action could it step in. Chief Justice Waite said: (p. 164)

"Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order."

Quoting from Jefferson's bill for establishing religious freedom, the Chief Justice stated:

" 'That to suffer the Civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their *ill tendency*, is a dangerous fallacy which at once destroys all religious liberty . . . it is time enough for the rightful purposes of civil government for its officers to interfere *when principles break out into overt acts against peace and good order.' In these two sentences is found the true distinction between what properly belongs to the church and what to the State."* (Italics supplied.)

The now familiar "clear and present danger" rule, first stated by Mr. Justice Holmes in Schenck v. United States, 249 U. S. 47 (1918), represents a compromise between the ideas of Jefferson and those of the judges, who had in the meantime departed from the forthright views of the great statesman. Under that rule the publisher of a writing may be punished if the publication in question creates a clear and present danger that there will result from it some substantive evil which the legislature has a right to proscribe and punish.

The famous illustration in the Schenck case was:

"The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force."

Mr. Justice Brandeis added, in Whitney v. California, 274 U. S. 357 (1927), the idea that free speech may not be curbed where the community has the chance to answer back. He said:

"Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes

of popular government, *no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion.* If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, *the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression.* Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is the command of the Constitution. It is therefore always open to Americans to challenge a law abridging free speech and assembly by showing that there was no emergency justifying it. (Italics supplied.)

"Moreover, even imminent danger cannot justify resort to prohibition of these functions essential to effective democracy, unless the evil apprehended is relatively serious. Prohibition of free speech and assembly is a measure so stringent that it would be inappropriate as the means for averting a relatively trivial harm to society. A police measure may be unconstitutional merely because the remedy, although effective as means of protection, is unduly harsh or oppressive. Thus, a State might, in the exercise of its police power, make any trespass upon the land of another a crime, regardless of the results or of the intent or purpose of the trespasser. It might, also, punish an attempt, a conspiracy, or an incitement to commit the trespass. But it is hardly conceivable that this Court would hold constitutional a statute which punished as a felony the mere voluntary assembly with a society formed to teach that pedestrians had the moral right to cross unenclosed, unposted, waste lands and to advocate their doing so, even if there was imminent danger that advocacy would lead to a trespass. The fact that speech is likely to result in some violence or in destruction of property is not enough to justify its suppression.

There must be the probability of serious injury to the State. Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly."

It is true that subsequent to the decision of the court in the Schenck case, Justices Holmes and Brandeis fought what for a time appeared to be a losing battle. To them the "clear and present danger" rule was a rule of the criminal law, and they applied it only to prohibit speech which incited to punishable conduct. See the dissenting opinion in Gitlow v. New York, 268 U. S. 652 (1925), where they say:

"If the publication of this document had been laid as *an attempt* to induce an uprising against government at once and not at some indefinite time in the future it would have presented a different question. The object would have been one with which the law might deal, subject to the doubt whether there was any danger that the publication could produce any result, or in other words, whether it was not futile and too remote from possible consequences. *But the indictment alleges the publication and nothing more.*" (Italics supplied.)

The history of the Supreme Court, since its decision in Gitlow v. New York, has been marked by gradual progress along the path staked out by Justices Holmes and Brandeis, culminating finally in the complete acceptance of their views.

This progress may be traced in the following decisions: Stromberg v. California, 283 U. S. 359 (1931); DeJonge v. Oregon, 299 U. S. 353 (1937); Herndon v. Lowry, 301 U. S. 242 (1937); Palko v. Connecticut, 302 U. S. 319 (1937); Lovell v. Griffin, 303 U. S. 444 (1938); Cantwell v. Connecticut, 310 U. S. 296 (1940); Thornhill v. Alabama, 310 U. S. 88 (1940); Bridges v. California, 314 U. S. 252 (1941); Board of Educa-

tion v. Barnette, 319 U. S. 624 (1943) ; Schneiderman v. United States, 320 U. S. 118 (1943) ; United States v. Ballard, 322 U. S. 78 (1944) ; Thomas v. Collins, 323 U. S. 516 (1945) ; Pennekamp v. Florida, 328 U. S. 331 (1946) ; Musser v. Utah, 333 U. S. 95 (1948).

As was said in Martin v. Struthers, 319 U. S. 141 (1943) :

"The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature, Lovell v. Griffin (citation), and necessarily protects the right to receive it."

There are other milestones in the judicial reëstablishment of freedom of speech and freedom of the press. We cite the language of the Supreme Court in some of those cases:

In Herndon v. Lowry, 301 U. S. 242 (1937), the court said:

"The power of a state to abridge freedom of speech and of assembly is the exception rather than the rule and the penalizing even of utterances of a defined character 'must find its justification in a reasonable apprehension of danger to organized government. The judgment of the legislature is not unfettered."

In DeJonge v. Oregon, 299 U. S. 353 (1937), the court said:

"These rights may be abused by using speech or press or assembly *in order to incite to violence and crime*. The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed." (Italics supplied.)

In Thornhill v. Alabama, 310 U. S. 88 (1940), the court said:

"Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgement of the liberty of such discussion can be justified only where the clear danger of substantive evils arises *under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion.*" (Italics supplied.)

The nature of the evil which the legislature has the power to guard against by enacting an obscenity statute is not clearly defined. As Jefferson saw it, the legislature was restricted to punishing criminal acts and not publications. To Holmes and Brandeis the bookseller could be punished if his relation to the criminal act was such that he could be said to have incited it. In neither view could the bookseller be punished if his books merely "tended" to result in illegal acts and much less if his books "tended" to lower the moral standards of the community. A much closer relationship was required. The legislature may validly prevent criminal acts and legislate to protect the moral standards of the community. But the threat must in either case be more than a mere tendency. The older cases which upheld obscenity statutes on the "tendency" theory would appear to be invalid in the light of the more recent expressions of the Supreme Court.

Thus the opinion of the Supreme Court in Bridges v. California, 314 U. S. 252 (1941) says: (p. 273)

"In accordance with what we have said on the 'clear

and present danger' cases, neither 'inherent tendency' nor 'reasonable tendency' is enough to justify a restriction of free expression."

In Pennekamp v. Florida, 328 U. S. 331 (1946), a case in which the resulting evil was said to be that of improperly influencing the administration of justice, the Supreme Court said, in discussing the Bridges case:

"In the Bridges Case the clear and present danger rule was applied to the stated issue of whether the expressions there under consideration prevented 'fair judicial trials free from coercion or intimidation.' Page 259. There was, of course, no question as to the power to punish for disturbances and disorder in the courtroom. Page 266. The danger to be guarded against is the 'substantive evil' sought to be prevented. Pages 261, 262, 263. In the Bridges Case that 'substantive evil' was primarily the 'disorderly and unfair administration of justice.' Pages 270, 271, 278."

In addition to being substantive, the evil which the legislature seeks to control must be substantial: Bridges v. California, supra. The evil consequence must be serious and the imminence high; the proof must be clear, that is to say, "a solidity of evidence should be required": Pennekamp v. Florida, supra. Or, as was said in a contempt of court case (Craig v. Harney, 331 U. S. 367 (1947)):

"The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of Justice. The danger must not be remote or even probable; *it must immediately imperil.*" (Italics supplied.)

These principles have not been applied specifically to an obscenity statute by any recent opinion of the United States Supreme Court, but as Mr. Justice Rutledge said orally when the "Hecate County" case, Doubleday & Co., Inc. v. People of New York, 93 L. Ed. 37 (an obscenity case), was recently argued before the court:

"Before we get to the question of clear and present danger, we've got to have something which the State can forbid as dangerous. We are talking in a vacuum until we can establish that there is some occasion for the exercise of the State's power."

"Yes, you must first ascertain the substantive evil at which the statute is aimed, and then determine whether the publication of this book constitutes a clear and present danger."

*"It is up to the State to demonstrate that there was a danger, and until they demonstrate that, plus the clarity and imminence of the danger, the constitutional prohibition would seem to apply."* (Italics supplied.) (Quoted in 17 U. S. Law Week (Supreme Court Sections 3118)).

This appears to me much closer to a correct solution of obscenity cases than several general dicta by the Supreme Court to the effect that obscenity is indictable just because it is obscenity. For example, in Near v. Minnesota, 283 U. S. 697 (1931), Chief Justice Hughes remarked: "On similar grounds, the primary requirements of decency may be enforced against obscene publications."

It seems impossible, in view of the late decisions under the first amendment, that the word "obscene" can any longer stand alone, lighted up only by a vague and mystic sense of impurity, unless it is interpreted by other solid factors such as clear and present danger, pornography, and divorcement from mere coarseness of vulgarity.

In Chaplinsky v. New Hampshire, 315 U. S. 568 (1942), however, Mr. Justice Murphy said this: (p. 571)

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and

obscene, the profane, the libellous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."

It is not clear to me, nor, I venture to assert, would it be to the Supreme Court, if faced directly by an appropriate case of literary obscenity, what words inflict injury by their very utterance or how such injury is inflicted. As for the notion of an obscene book tending to incite to an immediate breach of the peace, the proper point of emphasis is the breach of the peace. That is different from saying that obscenity automatically tends to a breach of the peace, for the idea is unreal.

The latest dictum on this subject is in Kovacs v. Cooper, decided on January 31, 1949, and reported in 17 U. S. Law Week 4163, where Mr. Justice Reed said:

"But in the *Winters* case (Winters v. New York, 333 U. S. 507 (1948)) we pointed out that prosecutions might be brought under statutes punishing the distribution of 'obscene, lewd, lascivious, filthy, indecent and disgusting' magazines. P. 511. We said, p. 518:

" 'The impossibility of defining the precise line between permissible uncertainty in statutes caused by describing crimes by words well understood through long use in the criminal law—obscene, lewd, lascivious, filthy, indecent or disgusting—and the unconstitutional vagueness that leaves a person uncertain as to the kind of prohibited conduct—massing stories to incite crime—has resulted in three arguments of this case in this Court.' "

The difficulty here is that insofar as they apply to literature, obscenity and its imposing string of synonyms do *not* have a fixed meaning through long use in the criminal law—or to put it the other way, that they have a very narrow and restricted meaning quite at variance with the assumption that obscenity

debauches public morals by a mysterious and self-executing process that can be feared but not proved.

Certainly the books before me do not command, or urge, or incite, or even encourage persons to commit sexual misconduct of a nature that the legislature has the right to prevent or punish. Nor are they an imminent threat to the morality of the community as a whole. The conduct described in them is at most offensive. It does not incite to unlawfulness of any kind. These facts are important in view of the following language of Justice Rutledge, speaking for Justices Murphy, Douglas and himself (the other members of the court did not reach the question) in Musser v. Utah, 333 U. S. 95 (1948) :

"The Utah statute was construed to proscribe any agreement to advocate the practice of polygamy. Thus the line was drawn between discussion and advocacy.

"The Constitution requires that the statute be limited more narrowly. *At the very least the line must be drawn between advocacy and incitment, and even the state's* power to punish incitement may vary with the nature of the speech, whether persuasive or coercive, the nature of the wrong induced, whether violent or merely offensive to the mores, and the degree of probability that the substantive evil actually will result." (Italics supplied.)

Freedom of expression is the touchiest and most important right we have; it is asserted frequently and vigorously, for the democratic process rests fundamentally on the need of people to argue, exhort, and clarify. Thomas v. Collins, supra (323 U. S. 516) speaks of ". . . the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment", and went on to say, at page 530:

"For these reasons any attempt to restrict those liberties must be justified by clear public interest,

threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, *must have clear support in public danger, actual or impending.* Only the gravest abuses, endangering paramount interest, give occasion for permissible limitation." (Italics supplied.)

The "preferred position" cases have been collected in Mr. Justice Frankfurter's concurring opinion in Kovacs v. Cooper, supra (decided January 31, 1949: 17 U. S. L. W. 4163). They are: Herndon v. Lowry, supra (301 U. S. 242); United States v. Carolene Products Co., 304 U. S. 144 (1948); Thornhill v. Alabama, 310 U. S. 88 (1940); Schneider v. State, 308 U. S. 147 (1939); Bridges v. California, supra (314 U. S. 252); Murdock v. Pennsylvania, 319 U. S. 105 (1943); Prince v. Massachusetts, 321 U. S. 158 (1944); Follett v. McCormick, 321 U. S. 573 (1944); Marsh v. Alabama, 326 U. S. 501 (1946); Pennekamp v. Florida, supra (328 U. S. 331); West Virginia State Board v. Barnette, 319 U. S. 624 (1943); Thomas v. Collins, supra (323 U. S. 516); Saia v. New York, 334 U. S. 558 (1948).

Mr. Justice Frankfurter sounds the warning that the phrase "preferred position" should not be allowed to become a rigid formula, lest another one grow beside it—that any legislative restriction on free speech be considered "presumptively invalid". The warning is well taken, for there are too many kinds of restriction as well as vehicles of free speech to warrant such rigidity. The Kovacs and Sara cases involve loud speakers and sound trucks, which are perilously close

to nuisances and even to threats to public health. There are many instances where the police power may be used, at the expense of free expression, where the threat to order or health is directly and imminently demonstrable. The point is to see and understand the danger, and to keep particular cases within or without the justifiable area of the police power.

Short of books that are sexually impure and pornographic, I can see no rational legal catalyst that can detect or define a clear and present danger inherent in a writing or that can demonstrate what result ensues from reading it. All that is relied upon, in a prosecution, is an indefinable fear for other people's moral standards—a fear that I regard as a democratic anomaly.

Finally, the Supreme Court, in Winters v. New York, supra (333 U. S. 507), held subdivision 2 of section 1141 of New York's Penal Law unconstitutional because it was vague and allowed punishment of matters within the protection of free speech. The court said:

"The appellant contends that the subsection violates the right of free speech and press because it is vague and indefinite. *It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment.* Stromberg v. California, 283 US 359, 369; Herndon v. Lowry, 301 US 242, 258. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment, violates an accused's rights under procedural due process and freedom of speech or press." (Italics supplied.)

I am clear that the books before me are within the protection of the first and fourteenth amendments of the Federal Constitution, and of article 1, sec. 7 of the Pennsylvania Constitution. They bear obvious internal evidence of an effort to portray certain segments of American life, including parts that more refined people than the characters may deplore, but which we know exist. The vulgarity and obscenity in them are inherent in the characters themselves and are obviously not set forth as erotic allurement or as an excuse for selling the volumes. Nor can it be said that they have the effect of inciting to lewdness, or of inciting to any sexual crime, or that they are sexually impure and pornographic, i. e., "dirt for dirt's sake".

### Definition of Obscenity as Sexual Impurity

Sexual impurity in literature (pornography, as some of the cases call it) I define as any writing whose dominant purpose and effect is erotic allurement—that is to say, a calculated and effective incitement to sexual desire. It is the effect that counts, more than the purpose, and no indictment can stand unless it can be shown. This definition is in accord with the cases that have restricted the meaning of obscenity and its synonyms to that of sexual impurity, and with those cases that have made erotic allurement the test of its effect.

This excludes from pornography medical or educational writings, whether in technical or layman's language, and whether used only in schools or generally distributed, whose dominant purpose and effect is exegetical and instructional rather than enticing. It leaves room for interpretation of individual books, for as long as censorship is considered necessary, it is as impossible as it is inadvisable to find a self-executing formula.

Sex education has been before the courts in many cases. In United States v. "Married Love", 48 F. (2d) 821 (1931), Judge Woolsey said:

"It makes also some apparently justified criticisms of the inopportune exercise by the man in the marriage relation of what are often referred to as his conjugal or marital rights, and it pleads with seriousness, and not without some eloquence, for a better understanding by husbands of the physical and emotional side of the sex life of their wives. I do not find anything exceptionable anywhere in the book, and I cannot imagine a normal mind to which this book would seem to be obscene or immoral within the proper definition of these words, or whose sex impulses would be stirred by reading it."

Judge Woolsey held similarly in United States v. "Contraception", 51 F. (2d) 525 (1931). Both of the above books were by Dr. Marie C. Stopes.

The case of United States v. Dennett, 39 F. (2d) 564 (C. C. A. 2d, 1930), involved a pamphlet written by a woman for the education of her children. Sections of it appear in the reporter's summary of the case, and show that it gave full and frank information, together with the view that the sexual impulse is not a base passion but as a great joy when accompanied by love between two human beings. In reversing a conviction, Judge Hand said:

"It also may reasonably be thought that accurate information, rather than mystery and curiosity, is better in the long run and is less likely to occasion lascivious thoughts than ignorance and anxiety. Perhaps instruction other than that which the defendant suggests would be better. That is a matter as to which there is bound to be a wide difference of opinion, but, irrespective of this, we hold that an accurate exposition of the relevant facts of the sex side of life in decent language and in manifestly serious and disin-

terested spirit cannot ordinarily be regarded as obscene. Any incidental tendency to arouse sex impulses which such a pamphlet may perhaps have, is apart from and subordinate to its main effect. The tendency can only exist in so far as it is inherent in any sex instruction, and it would seem to be outweighed by the elimination of ignorance, curiosity, and morbid fear. The direct aim and the net result is to promote understanding and self-control."

The definition of sexual impurity given above brings literary obscenity into workable analogy with sedition, blasphemy, open lewdness, and the other examples set forth earlier, as those terms are used in our Penal Code, except for one remaining point. Sedition, blasphemy, and open lewdness, by definition, carry their own threat of danger to the public peace. The deep and peculiar nature of religious faith is such that people are entitled to protection against those who call their gods in vain; religion has too recently and for too long been one of the greatest of the fighting faiths to assume that disorder will not follow from public irreverence. He who is publicly lewd is in himself an open and immediate invitation to morally criminal behavior. The pressing danger inherent in sedition speaks for itself.

A book, however sexually impure and pornographic, is in a different case. It cannot be a present danger unless its reader closes it, lays it aside, and transmutes its erotic allurement into overt action. That such action must inevitably follow as a direct consequence of reading the book does not bear analysis, nor is it borne out by general human experience; too much can intervene and too many diversions take place. It must be constantly borne in mind that section 524 does not include the element of debauching public morals or of seeking to alter the prevailing moral code. It only proscribes what *is* obscene, and that term is meaningless unless activated by precise dangers within legal limits. Since

section 524 provides no standard, the danger and the limits must be found elsewhere, and the only clear and discernible ones are those having to do with the police power and the preservation of the peace.

### The Clear and Present Danger

I have pointed out above that any test of the effect of obscenity is bound to be elusive. Section 524 is therefore vague, indefinite, and unconstitutional unless some exact definition can be found for the "clear and present danger" to be prevented that will satisfy the constitutional protection of free speech. There are various types of cases in which definition is clear because the need is clear. The police power operates in pure food cases because people can sicken and die from eating bad food; in traffic cases because people can be injured or killed unless there is regulation; in weights and measures cases because of the ease with which the consumer can be cheated, and in conventional crimes because of the threat to persons and property. The list could be extended.

Mr. Justice Holmes's example in Schenck v. United States is no test for the case before me; the public does not read a book and simultaneously rush by the hundreds into the streets to engage in orgiastic riots. Mr. Justice Brandeis's discussion in Whitney v. California is a better yardstick, for in the field of the printed word the community has full opportunity to answer back. How can it be said that there is a "clear and present danger"—granted that anyone can say what it is—when there is both time and means for ample discussion?

These words of Jefferson should not be forgotten:

"I deplore . . . the putrid state into which our newspapers have passed, and the malignity, the vulgarity, and the mendacious spirit of those who write them. . . . These ordures are rapidly depraving the public taste.

"It is, however, an evil for which there is no remedy: our liberty depends on the freedom of the press, and that cannot be limited without being lost."

Who can define the clear and present danger to the community that arises from reading a book? If we say it is that the reader is young and inexperienced and incapable of resisting the sexual temptations that the book may present to him, we put the entire reading public at the mercy of the adolescent mind and of those adolescents who do not have the expected advantages of home influence, school training, or religious teaching. Nor can we say into how many such hands the book may come. Adults, or even a gifted minor, may be capable of challenging the book in public and thus of forwarding the education and enlightenment of us all by free discussion and correction. If the argument be applied to the general public, the situation becomes absurd, for then no publication is safe. How is it possible to say that reading a certain book is bound to make people behave in a way that is socially undesirable? And beyond a reasonable doubt, since we are dealing with a penal statute?

We might remember the words of Macaulay:

"We find it difficult to believe that in a world so full of temptations as this, any gentleman, whose life would have been virtuous if he had not read Aristophanes and Juvenal, will be made vicious by reading them."

Substitute the names of the books before me for "Aristophanes and Juvenal", and the analogy is exact.

The only clear and present danger to be prevented by section 524 that will satisfy both the Constitution and the current customs of our era is the commission or the imminence of the commission of criminal behavior resulting from the reading of a book. Publication alone can have no such automatic effect.

## The Rule of Decision

Thus limited, the constitutional operation of section 524 of our act rests on narrow ground.

The modern test of obscenity, as I have stated it above (page 136), furnishes a means of determining whether a book, taken as a whole, is sexually impure, as I have defined that term (page 151, ante).

I hold that section 524 may not constitutionally be applied to any writing unless it is sexually impure and pornographic. It may then be applied, as an exercise of the police power, only where there is a reasonable and demonstrable cause to believe that a crime or misdemeanor has been committed or is about to be committed as the perceptible result of the publication and distribution of the writing in question: the opinion of anyone that a tendency thereto exists or that such a result is self-evident is insufficient and irrelevant. The causal connection between the book and the criminal behavior must appear beyond a reasonable doubt. The criminal law is not, in my opinion, "the custos morum of the King's subjects", as Regina v. Hicklin states: it is only the custodian of the peace and good order that free men and women need for the shaping of their common destiny.

There is no such proof in the instant case.

For that reason, and also because of the character of the books themselves, I hold that the books before me are not sexually impure and pornographic, and are therefore not obscene, lewd, lascivious, filthy, indecent, or disgusting. The sustaining of the demurrers follows.